Hillsborough-southern judicial district
No. 2004-232

WUDSON ROSA

v.

PARTNERS IN PROGRESS, INC. *& a.*

WUDSON ROSA

v.

UNITED RENTALS, INC.

Argued: November 30, 2004
Opinion Issued: March 4, 2005

*Gottesman & Hollis, P.A.*, of Nashua (*Paul M. DeCarolis* on the brief and orally), for the plaintiff.

*Desmarais, Ewing & Johnston, PLLC*, of Manchester (*Scott A. Ewing* on the brief and orally), for defendant Partners in Progress, Inc.

*Getman, Stacey, Schulthess & Steere, P.A.*, of Bedford (*John A. Curran* on the brief and orally), for defendant Wrenn Associates, Inc.

*Friedman Gaythwaite Wolf & Leavitt*, of Portland, Maine (*Karen Frink Wolf* and *Heidi A. Bean* on the brief, and *Ms. Wolf* orally), for defendant United Rentals, Inc.

DALIANIS, J. These consolidated cases are before the court on interlocutory transfer without ruling. SUP. CT. R. 9.

The record reflects the following facts. The case involves the construction of a Wal-Mart store in Manchester and the purported status of the plaintiff, Wudson Rosa, as an illegal alien. Defendant Wrenn Associates, Inc. (Wrenn) was hired by Wal-Mart as the general contractor of the construction project. Wrenn subcontracted the painting of the Wal-Mart building to defendant Partners in Progress, Inc. (Partners). Partners in turn subcontracted the task of painting the exterior of the building to

Eagle General Laborers (Eagle). On December 9, 2000, the plaintiff, a Brazilian citizen and an employee of Eagle, was injured while working at the Wal-Mart construction site when an aerial lift, owned and rented by defendant United Rentals, Inc., tipped over and fell on him.

On December 26, 2001, the plaintiff brought a civil suit against the defendants for damages resulting from his injuries, which included a claim for lost earning capacity measured at United States wage levels. Prior to trial, the defendants filed motions arguing that the plaintiff should be prohibited from making a claim for lost earning capacity, or that the trial court should limit the scope of his claim. The plaintiff, on the other hand, filed motions arguing that evidence concerning his immigration status should be excluded from the trial because it is of limited relevance and unfairly prejudicial.

The Superior Court (*Groff*, J.) transferred the following questions: (1) "Is the plaintiff permitted to introduce evidence and make a claim of lost wage/earning capacity when he is not legally entitled to work in the United States at the time of his accident?"; (2) "If he is entitled to bring a claim for lost wage/earnings [*sic*], should those be limited to earnings that he could anticipate receiving in his country of full citizenship?"; and (3) "To the extent a lost wage/earning capacity claim is introduced, are the defendants entitled to introduce testimony of the plaintiff's immigration status and the fact that he was not legally entitled to work in this country as evidence to rebut the damage claim?"

■ Each issue in this case presents a question of law of first impression for this court. We begin by addressing the first transferred question. The defendants argue that the plaintiff should be completely precluded from bringing a claim for lost earning capacity. We disagree.

"[A] well established body of law holds that illegal aliens have rights of access to the courts and are eligible to sue therein to enforce contracts and redress civil wrongs such as negligently inflicted personal injuries." *Mendoza v. Monmouth Recycling Corp.*, 672 A.2d 221, 225 (N.J. Super. Ct. App. Div. 1996) (quotation omitted); *see also Arteaga v. Literski*, 265 N.W.2d 148, 150 (Wis. 1978) ("There is no public policy that is served by refusing access to our courts to illegal aliens who are injured through the negligence of another."); *Janusis v. Long*, 188 N.E. 228, 231-32 (Mass. 1933); *Martinez v. Fox Valley Bus Lines*, 17 F. Supp. 576, 577 (N.D. Ill. 1936).

We see no reason to separate an illegal alien's claim for lost earning capacity from the umbrella of other claims that he may make under tort

law, for "[s]urely the effect on the worker of his injury has nothing to do with his citizenship or immigration status." *Mendoza*, 672 A.2d at 224. Therefore, we answer the first transferred question in the affirmative.

We next address the second transferred question. The defendants argue that even if an illegal alien may bring an action for lost earning capacity, that capacity may not be measured by what the illegal alien could have earned, but for his injury, unlawfully working in the United States. Rather, the defendants argue, the lost earning capacity must be measured by what the illegal alien could have earned lawfully working in his country of origin. While we agree that, in most circumstances, the defendants are correct, there are some circumstances in which an illegal alien's lost earning capacity may be measured by what he could have earned in the United States.

The defendants base their argument, in part, upon the United States Supreme Court's decision in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), and decisional law that has followed. In *Hoffman*, the Court overturned an award of back pay to an illegal alien who had been unlawfully discharged by his employer in violation of the National Labor Relations Act (NLRA). *Hoffman*, 535 U.S. at 152. In reaching its decision, the Court relied upon the apparent conflict between an award of back pay and the Immigration Reform and Control Act of 1986 (IRCA), 8 U.S.C. § 1324a (2000), which is "a comprehensive scheme prohibiting the employment of illegal aliens in the United States." *Hoffman*, 535 U.S. at 147.

IRCA established "an extensive employment verification system . . . designed to deny employment to aliens who (a) are not lawfully present in the United States, or (b) are not lawfully authorized to work in the United States . . . ." *Id.* (citations and quotation omitted). "IRCA mandates that employers verify the identity and eligibility of all new hires by examining specified documents before they begin work. If an alien applicant is unable to present the required documentation, the unauthorized alien cannot be hired." *Id.* at 148 (citation omitted).

"Similarly, if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status." *Id.* "Employers who violate IRCA are punished by civil fines . . . and may be subject to criminal prosecution . . . ." *Id.* (citations omitted). "IRCA also makes it a crime for an unauthorized alien to subvert the employer verification system by tendering fraudulent documents." *Id.* "It thus prohibits aliens from using or attempting to use any forged,

counterfeit, altered, or falsely made document or any document lawfully issued to or with respect to a person other than the possessor for purposes of obtaining employment in the United States." *Id.* (quotations omitted). "Aliens who use or attempt to use such documents are subject to fines and criminal prosecution." *Id.*

The Supreme Court pointed out:

> Under the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies. Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations.

*Id.*

The Court held that "awarding backpay to illegal aliens runs counter to policies underlying IRCA, policies the [National Labor Relations] Board has no authority to enforce or administer. Therefore, ... the award lies beyond the bounds of the Board's remedial discretion." *Id.* at 149. The Court concluded that "allowing the Board to award backpay to illegal aliens would unduly entrench upon explicit prohibitions critical to federal immigration policy, as expressed in IRCA. It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations." *Id.* at 151. The Court suggested that to hold otherwise would allow the Board to award back pay "for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud." *Id.* at 149.

In his dissent, Justice Breyer, joined by Justices Stevens, Souter and Ginsburg, argued that failing to award back pay to an illegal alien unlawfully fired by an employer who *knew* of his status would encourage employers to hire illegal aliens because it would "lower[] the cost to the employer of an initial labor law violation." *Id.* at 155. The dissent pointed out that, among other things, the majority's decision addressed an award to an illegal alien who had obtained his job by submitting fraudulent documents, and argued, "Were the Board forbidden to assess backpay to a *knowing* employer—a circumstance not before us today . . .—this perverse economic incentive, which runs directly contrary to the immigration statute's basic objective, would be obvious and serious." *Id.* at 155-56.

Courts that have addressed whether *Hoffman* affects an illegal alien's ability to recover lost United States wages under state law have produced inconsistent results. In *Veliz v. Rental Service Corp. USA, Inc.*, 313 F. Supp. 2d 1317 (M.D. Fla. 2003), the federal district court relied upon *Hoffman* to hold that a laborer's undocumented alien status precluded an award of lost United States wages, where the record reflected that the laborer "unlawfully subverted IRCA's enforcement mechanism [by] tendering fraudulent identification to obtain employment." *Veliz*, 313 F. Supp. 2d at 1335-36. Similarly, in *Hernandez-Cortez v. Hernandez*, a federal district court, relying upon *Hoffman*, disallowed illegal alien plaintiffs' claims for lost United States earnings where the plaintiffs brought a negligence action for personal injuries resulting from a motor vehicle accident. *Hernandez-Cortez v. Hernandez*, No. Civ.A 01-1241-JTM, 2003 WL 22519678, at *6-7 (D. Kan. Nov. 4, 2003). The court noted that "while many illegal aliens do find employment in the United States, this argument does not overcome [8 U.S.C.] § 1324a and *Hoffman.*" *Id.*

In *Majlinger v. Cassino Contracting Corp.*, 766 N.Y.S.2d 332 (Sup. Ct. 2003), the trial court found that although New York appellate courts in the past had permitted illegal alien plaintiffs to prove lost United States wages, *see, e.g., Public Adm'r of Bronx County v. Equitable Life Assur. Socy.*, 595 N.Y.S.2d 478 (App. Div. 1993); *Collins v. NYC Health and Hospitals Corp.*, 607 N.Y.S.2d 387 (App. Div. 1994), the *Hoffman* decision "would appear to require this court to conclude that the plaintiff should not be permitted to recover for lost wages given his inability to prove he is legally authorized to work in this country." *Majlinger*, 766 N.Y.S.2d at 333-34. And, in *Sanango v. 200 East 16th Street Housing Corp.*, 788 N.Y.S.2d 314, 321 (App. Div. 2004), a court vacated a jury verdict awarding the plaintiff lost United States earnings and remanded for a trial for a determination of the earnings that the plaintiff may have earned in his country of origin.

However, in *Madeira v. Affordable Housing Foundation, Inc.*, 315 F. Supp. 2d 504, 507 (S.D.N.Y. 2004), a federal district court disagreed with *Majlinger* and *Veliz*. The court upheld a jury's award of lost earnings to an illegal alien plaintiff who brought an action against the site owner and general contractor to recover damages for personal injuries sustained in the course of his work on a construction site. *Madeira*, 315 F. Supp. 2d at 505, 507. In its ruling the court stated, "The jury obviously concluded that plaintiff would have obtained employment in the United States, where he has continuously resided since the accident, if he had not been severely

injured by his fall. And the fact is, undocumented aliens do obtain work in the United States." *Id.* at 507.

We note that *Hoffman* is not solely responsible for this inconsistency, as courts had produced inconsistent results prior to *Hoffman*. For example, in *Rodriguez v. Kline*, a California appellate court, relying upon IRCA, ruled that an illegal alien may only recover lost United States earnings when he can "demonstrate to the court's satisfaction that he has taken steps that will correct his deportable condition." *Rodriguez v. Kline*, 232 Cal. Rptr. 157, 158 (Ct. App. 1986). By contrast, in *Hernandez v. M/V Rajaan*, 848 F.2d 498, 500 (5th Cir. 1988) (per curiam), the Fifth Circuit Court of Appeals ruled that once an illegal alien who was injured on the job has "prove[n] his prior wages in the United States," he may recover such earnings from his negligent employer based upon his past earnings stream unless the employer can establish that he was about to be or would surely be deported.

Having reviewed the current legal framework, we now begin our analysis of the second transferred question. No defendant in this case argues that IRCA preempts New Hampshire common law. *Compare Sanango*, 788 N.Y.S.2d at 319 (holding that because of the ruling in *Hoffman*, federal law under IRCA preempts "New York law, to the extent it would permit plaintiff to recover the wages he would have earned illegally in the United States") *with Balbuena v. IDR Realty*, 787 N.Y.S.2d 35, 36-37 (App. Div. 2004) (Ellerin, J., dissenting) (State common law on the recoverability of lost wages in tort actions does not "conflict with or present an obstacle to the accomplishment of the objectives of the IRCA" because it does not "address the employment of illegal aliens in the United States" (quotation omitted)).

While we presume that *Hoffman* is not controlling here, and although the aforementioned conflicting decisions provide no clear path, we find both sources instructive. One argument advanced by Partners against allowing illegal aliens to recover lost United States earnings is that such a policy would undermine IRCA, because providing illegal aliens with the potential to recover lost earnings, would, in theory, increase the economic incentives that draw illegal aliens to this country. But, as a federal district court made clear in *Singh v. Jutla*, 214 F. Supp. 2d 1056, 1062 (N.D. Cal. 2002):

> [E]very remedy extended to undocumented workers ... provides a marginal incentive for those workers to come to the United States. It is just as true, however, that every remedy denied to

undocumented workers provides a marginal incentive for employers to hire those workers. The economic incentives are in tension. Given this tension, the courts must attempt to sensibly balance competing considerations.

A policy that does not permit recovery will marginally lower the costs for the employment of illegal aliens, and "employers might find it economically advantageous to hire ... undocumented workers and run the risk of sanctions under the IRCA." *Patel v. Quality Inn South*, 846 F.2d 700, 704 (11th Cir. 1988). Likewise, a policy that does permit recovery will marginally increase an illegal alien's incentive to enter the country, knowing that should he be injured, he would be compensated at United States wage levels.

■ The strongest argument against the recovery of lost United States earnings is that a "contrary rule, of course, would allow someone who is not lawfully available for future work in the United States to receive compensation to which he is not entitled." *Rodriguez*, 232 Cal. Rptr. at 158. Allowing an illegal alien to recover lost United States earnings creates a paradoxical situation in which an illegal alien can lawfully become entitled to the value of United States wages only if he becomes physically unable to work. Although the failure to award such damages may conflict with the cardinal principle of damages in Anglo-American law, which is to provide compensation for injury caused to a plaintiff by a defendant's breach of duty, *Carey v. Piphus*, 435 U.S. 247, 254 (1978), we hold that generally an illegal alien may not recover lost United States earnings, because such earnings may be realized only if that illegal alien engages in unlawful employment.

Nonetheless, tort deterrence principles provide a compelling reason to allow an award of such damages against a person responsible for an illegal alien's employment when that person knew or should have known of that illegal alien's status. The threat of tort liability acts as an incentive to reduce the risk of injuries. *Estate of Cargill v. City of Rochester*, 119 N.H. 661, 666 (1979). To refuse to allow recovery against a person responsible for an illegal alien's employment who knew or should have known of the illegal alien's status would provide an incentive for such persons to target illegal aliens for employment in the most dangerous jobs or to provide illegal aliens with substandard working conditions. It would allow such persons to treat illegal aliens as disposable commodities who may be replaced the moment they are damaged. Such a result is incompatible with tort deterrence principles.

We recognize that there may be no other contexts "in which a person who has derived income from an illegal activity is permitted, after a personal injury forces him to abandon that activity, to recover damages based on the lost stream of illegal income through judicial proceedings in a court of law." *Sanango*, 788 N.Y.S.2d at 320-21. We also recognize that "estoppel by the employer's acts" should not bar "the enforcement of our country's Immigration laws." *Rivera v. Nibco, Inc.*, 384 F.3d 822, 823 (9th Cir. 2004) (Bea, J., dissenting from denial of rehearing *en banc*). Allowing recovery of lost wages under limited circumstances will not, in our opinion, bar enforcement of our immigration laws. And, although allowing an illegal alien to recover against such a person may transform the illegal alien's unlawful wages into lawful compensation, a person responsible for an illegal alien's employment may avoid this situation by *refusing to employ the illegal alien in the first place*. Surely, such a rule will *not* "frustrate explicitly stated congressional public policy." *Id.*

IRCA provides that it is unlawful to hire an alien knowing that he is an unauthorized alien, or to fail to comply with IRCA's employment verification system. 8 U.S.C. § 1324a(a)(1)(A), (B). IRCA "places an affirmative duty on employers to determine that their employees are authorized [and] it has been held that an employer is imputed with constructive knowledge that a worker is unauthorized if the employer deliberately fails to investigate suspicious circumstances." *Zamora v. Elite Logistics, Inc.*, 316 F. Supp. 2d 1107, 1119 (D. Kan. 2004) (citing *New El Rey Sausage Co. v. U.S. I.N.S.*, 925 F.2d 1153, 1157-58 (9th Cir. 1991)). Given the strict requirements of IRCA and the compensation and deterrence principles of tort law, a rule holding a person responsible for an illegal alien's employment liable for lost United States earnings when that person knew or should have known of an illegal alien's status will not undermine the policy goals of IRCA.

We recognize that defendants Partners and Wrenn, as general contractors, are not direct employers of the plaintiff. Yet, IRCA does not excuse general contractors who knowingly employ an illegal alien. 8 U.S.C. § 1324a(a)(4) ("[A] person or other entity who uses a contract, subcontract, or exchange ... to obtain the labor of an alien in the United States knowing that the alien is an unauthorized alien ... shall be considered to have hired the alien for employment in the United States in violation of [IRCA]."). Nor should a general contractor be excused from compensating an illegal alien for lost United States earnings when the general contractor knew or should have known of that illegal alien's status. We choose to hold a general contractor to a standard based upon constructive knowledge

because to hold otherwise would provide a general contractor with a convenient device to insulate itself from damages, because it would be all too easy to claim ignorance.

■ Partners argues that an illegal alien should be barred from claiming lost United States earnings because the "very nature of an undocumented worker's uncertain and unstable status in the United States militates against permitting him to speculate as to wages earned while in this country." As Partners points out, an illegal alien could, in theory, be deported at any time. *See Rodriguez*, 232 Cal. Rptr. at 158. While an illegal alien's potential to remain in the country and continue to work here may be uncertain and difficult to prove, we hold that, as a matter of public policy, a person responsible for an illegal alien's employment who knew or should have known of that illegal alien's status may not employ an illegal alien's potential for deportation as a bar to that illegal alien's recovery of lost United States earnings.

■ A person *responsible* for an illegal alien's employment may be held liable for lost United States wages if that illegal alien can show that the person knew or should have known of his status, yet hired or continued to employ him nonetheless. Further, although IRCA penalizes an illegal alien who submits fraudulent documents, such fraud will not bar recovery by an illegal alien unless the person responsible for such employment *reasonably* relied upon those documents.

■ We now address the third transferred question—the extent to which a defendant may introduce evidence of the illegal alien's status to rebut a claim for lost United States earnings. Generally, an illegal alien may not recover lost United States earnings. Thus, an illegal alien's status, though irrelevant to the issue of liability, *see Melendres v. Soales*, 306 N.W.2d 399, 402 (Mich. Ct. App. 1981), is relevant on the issue of lost earnings. The plaintiff argues that evidence of his illegal alien status is unfairly prejudicial. Though evidence of his status may well be prejudicial, such evidence, as described above, is essential should an illegal alien wish to pursue a claim for lost earning capacity measured at United States wage levels.

*Remanded.*

BRODERICK, C.J., and NADEAU and DUGGAN, JJ., concurred.