Opinion issued January
20, 2011

 



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00236-CV

———————————

REPUBLIC WASTE SERVICES, LTD. AND MARCO CASTANEDA, Appellants

V.

ELIDA GRISELDA MARTINEZ,
INDIVIDUALLY AND A/N/F OF AMALIA GRISELDA GOMEZ, A MINOR, AND ON BEHALF OF THE
ESTATE OF OSCAR ALFREDO GOMEZ, DECEASED, AND CARLOS GOMEZ PORTILLO, Appellees



 



 

On Appeal from Probate Court No. 2

Harris County, Texas



Trial Court Case No. 372492-401

 



 

 

 

 

O P I N I O N

          This wrongful death and survival
action arises from the on-the-job death of Oscar Alfredo Gomez.  Following a jury trial, the trial court
rendered judgment for $1,408,491 in favor of Gomez’s common-law wife, Elida
Griselda Martinez, and Gomez’s father, Carlos Gomez Portillo, against
appellants, Republic Waste Services, Ltd. and Marco Castaneda.  

          On appeal, appellants challenge the
trial court’s decision to exclude evidence concerning Gomez’s illegal immigrant
status.  Appellants assert that the
evidence was relevant to the issue of damages, specifically appellees’ request
to recover Gomez’s future lost earnings. 
Because we conclude that, under the circumstances of this case, the
trial court reasonably exercised its discretion to exclude the evidence, we
affirm the judgment of the trial court.

Factual
& Procedural Background

          Oscar Alfredo Gomez and his common-law
wife, Elida Griselda Martinez, immigrated to Houston from El Salvador.  Gomez did not have a passport or a work
visa.  He used the social security number
and “green card” of another individual to obtain a job with Republic Waste
Services, Ltd., a garbage collection business.  Republic hired Gomez to be a helper on one of
its garbage trucks.  

          On the day of his death, Gomez was
working on a garbage truck driven by Republic employee Marco Castaneda.  As the garbage crew finished their last job,
Castaneda backed the truck down a street and ran over Gomez.  Gomez died of his injuries.  Only then did Republic learn that Gomez had
falsified immigration documents to gain employment with the company.

          As Gomez’s surviving spouse, Martinez
filed a wrongful death suit alleging negligence against Castaneda and Republic,
a non-subscriber to the Texas Worker’s Compensation Act.  Martinez filed suit individually, as representative of
her husband’s estate, and as next friend of their minor child, Amalia Griselda
Gomez.  Gomez’s father, Carlos Gomez Portillo, also filed suit against Republic
and Castaneda.  

          Before trial, Martinez and Portillo
(hereinafter “appellees”) filed a motion in limine.  Among the in limine requests, appellees asked
the trial court to prohibit appellants from mentioning any evidence concerning
Gomez’s illegal immigrant status until the court ruled on the admissibility of
the evidence outside the presence of the jury. 


          At the in limine hearing, appellees
asserted that evidence regarding Gomez’s illegal status was not relevant and
was highly prejudicial.  Appellants
disagreed, asserting that evidence regarding Gomez’s illegal status was
relevant to the issue of Gomez’s future lost income, which was an element of
the pecuniary damages appellees sought to recover.  

          Appellants told the trial court that
they planned to introduce evidence showing that federal immigration authorities
had raided Republic’s facilities two weeks after Gomez’s death.  That day, the authorities had arrested and
removed a number of Republic employees, who were undocumented workers.  Appellants told the court that a number of
the workers never returned to Republic. 
Appellants argued that Gomez certainly would have been removed that day
because he had fake employment documents. 


          Appellants also told the trial court
that appellees planned to show that 21-year-old Gomez had earned $33,000 per
year working for Republic.  Appellants
anticipated that appellees’ evidence would show that, had he lived, Gomez would
have worked another 35 to 40 years in the United States earning $33,000 per
year.  Appellants maintained that their
evidence regarding Gomez’s illegal status would demonstrate that Gomez was
subject to immediate deportation, and that, in all likelihood he would have
been deported following the federal raid at Republic.  Appellants argued that such evidence was
relevant to counter appellees’ damages model for lost future income.  In short, appellants indicated that the
evidence was probative of whether Gomez’s future income would be earned in the
United States or in his native El Salvador, where he had earned only $1,000 per
year.  Appellants argued that the jury should be allowed to
weigh and consider the evidence, specifically the likelihood that Gomez would
have been deported, in determining lost future income damages.  

          Appellees responded that the
immigration evidence was irrelevant and overly prejudicial.  They asserted that the evidence did not prove
that Gomez was likely to be deported or that Gomez would not have continued to
work in the United States.  Appellees
argued that the immigration evidence was too speculative and conjectural to be
of probative value when weighed against the risk of prejudice inherent in
telling the jury that Gomez was an illegal immigrant.  The trial court agreed with appellees noting
that it was “gross speculation” whether Gomez would have been deported.  After much debate and consideration, the
trial court agreed with appellees and granted the in limine request regarding
the immigration evidence. 

          At trial, Martinez testified that she
and Gomez came to Houston to start a new life. 
Martinez testified that she was six months pregnant with her daughter,
Amalia, when Gomez was killed.  She told
the jury that Gomez was very excited about the baby.  Her testimony indicated that they were happy
and hoped to stay in the United States.  

          Gomez’s father also testified at
trial.  He told the jury that his son had
worked with him in El Salvador on a dairy farm making $15 to $20 per week or
approximately $1,000 per year.  After
moving to the United States, Gomez sent his father $100 per month.  

          Appellees’ economist, Dr. Kenneth
McCoin, estimated that, had he lived, Gomez would have earned $33,000 per year
for the next 36 years working in the United States.  Dr. McCoin calculated appellees’ total loss
of future support to be $1,196,621.  On
cross-examination, Dr. McCoin testified that had Gomez worked the next 36 years
in El Salvador, earning $1,000 per year, Gomez’s future economic losses would
have been roughly $28,800.

          Appellants made bills of exception
detailing the evidence that they were prepared to offer regarding Gomez’s
illegal immigrant status.  Outside the
presence of the jury, appellants elicited testimony from Martinez, Dr. McCoin,
and 

Scott
Bradshaw, who is Republic’s general manager. 


          Bradshaw testified during the bill of
exception that Gomez had used fake documents to obtain employment with
Republic.  The company did not discover
the deception until after Gomez’s death. 
In her bill-of-exception testimony, Martinez confirmed that Gomez had
used another individual’s social security card and green card to obtain
employment with Republic.  

          As part of the bill of exception,
Bradshaw also testified that two weeks after Gomez’s death, officials from the
United States Immigration and Customs Enforcement (ICE) held a surprise raid at
Republic’s Houston facility.  The raid
occurred at the beginning of a shift.  According to Bradshaw, “They detained everyone
at the building and those [sic] as they entered the property.”  He continued, “They looked at [the employees’]
paperwork; and those that had a mismatch, they detained and hauled off the
property.”  

          Bradshaw testified that 50 to 55 of
Republic’s employees were detained and taken from the facility during the ICE
raid.  Approximately 30 of those detained
never returned to Republic.  At the time
of trial, nearly two years later, there was still a van parked in Republic’s
parking lot that belonged to one of the detained workers.

          Appellees’ expert economist, Dr.
McCoin, testified in the bill of exception that he had not factored in Gomez’s
illegal immigrant status when calculating future lost income.  Dr. McCoin agreed that Gomez’s “work-life
statistic” would be affected by his illegal immigrant status because there was
an increased risk that he would be “ejected from the workforce.”  Dr. McCoin stated that he did not know what
the risk of deportation was for Gomez. 
Dr. McCoin then testified that there are, however, “two sides to
it.”  

          Dr. McCoin explained that an illegal
immigrant has a strong motivation to remain in the United States because he
often has few alternatives in his native country.  Dr. McCoin testified that illegal immigrants
are willing to work longer hours for less pay than legal workers.  These factors operate to offset the effect of
the risk of deportation, although he did not know how much.  

          Appellants’ counsel asked, “If [Gomez]
is deported, it certainly affects the assumption that you made that he would
have continued to work at the 33,000-some-odd-dollar level that you assumed, doesn’t
it?”  Dr. McCoin responded, “Well, no.  Because, again, he comes back across [the border].  They can deport him.  They can deport him a jillion times, and he
comes right back over.”  Dr. McCoin
continued, “That’s been known to happen and does happen all the time.  But we’re not tethering him to this company, but
we are tethering him to that wage.”

          When appellants’ counsel asked whether
Dr. McCoin’s assumption that Gomez would earn $33,000 for 37 years factored in
the chance that Gomez might be deported, Dr. McCoin answered
affirmatively.  Dr. McCoin explained
that, although Gomez’s chance of deportation reduced his “work probability,”
the reduced work probability was offset by Gomez’s strong desire to work.  Dr. McCoin explained that he did not know
what Gomez’s work probability would be when these factors are also
considered.  

          After each of the three witnesses
testified during the bill of exception, appellees objected that the evidence
was irrelevant, “highly prejudicial,” and speculative.  The trial court sustained appellees’
objections.  As a result, the jury did
not hear appellants’ evidence concerning Gomez’s illegal immigrant status.  

          The jury found that appellants’
negligence caused Gomez’s death and awarded $1,408,491 to appellees.  This included $1,275,000 for future pecuniary
losses.[1]  

          The trial court rendered judgment on
the jury’s verdict.  This appeal
followed.

Evidence
Concerning Gomez’s Illegal Immigrant Status

          In one issue, appellants contend that
the trial court erred in excluding their evidence regarding Gomez’s illegal
immigrant status.[2]  

A.      Standard
and Scope of Review

          We review a trial court’s evidentiary
rulings for an abuse of discretion. Horizon/CMS
Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex. 2000).  To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles; in other words, we must decide whether the act
was arbitrary or unreasonable.  See Cire v. Cummings, 134 S.W.3d 835,
838–39 (Tex. 2004).

          We must uphold the trial court’s
evidentiary ruling if there is any legitimate basis in the record for the
ruling.  See Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43
(Tex. 1998).  We cannot conclude a trial
court abused its discretion merely because we would have ruled differently in
the same circumstances.  See E.I.
du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995).

          With these principles in mind, we
determine whether appellants have shown that the trial court abused its
discretion when it excluded the evidence presented by appellants in their bill
of exception concerning Gomez’s illegal immigrant status.

 

 

B.      Analysis

          1.       Relevance

          Appellants focus primarily on the
relevance of the disputed evidence.  Relevant
evidence is evidence having any tendency to make the existence of any fact that
is of consequence to the determination of the action more probable or less
probable than it would be without the evidence.  Tex. R.
Evid. 401.  The test for relevancy is satisfied
if there is directly, or by inference, some logical conclusion between the fact
offered and the fact to be proven.  Boswell v. Brazos Elec. Power Co-op.,
910 S.W.2d 593, 601 n.3 (Tex. App.—Fort Worth 1995, writ denied).

          Appellants argue that the trial court
abused its discretion in excluding the evidence concerning Gomez’s illegal status
because the evidence is relevant to the jury’s proper determination of future
lost income.  They assert that the
evidence was needed to counter appellees’ request for lost future wages based
on Gomez’s past earnings in the United States. 
Appellants contend that evidence indicating that Gomez was subject to
immediate deportation was relevant to show that Gomez’s employment in the
United States would likely have been less than the 36 years claimed by
appellees.  Rather, based on his
undocumented immigration status, Gomez likely would have returned to El
Salvador either voluntarily or involuntarily for all or part of the 36
years.  In short, appellants assert that
the disputed evidence is relevant to the jury’s determination of whether Gomez would
have spent his remaining working lifetime in the United States or in his native
country of El Salvador.  This
determination correlates directly with the amount of future lost wages Gomez
would have earned but for his death.  

          In determining the relevancy of the
disputed evidence, it is helpful to understand the nature of pecuniary loss
damages.  In this case, pecuniary damages
appear to be comprised largely of the loss of monetary support that appellees
would have received from Gomez had he lived. 
Generally, determination of pecuniary loss damages is a nebulous and
somewhat imprecise process.  See Thomas v. Uzoka, 290 S.W.3d 437, 454
(Tex. App.—Houston [14th Dist.] 2009, pet. denied).  The amount of income that may be earned in
the future by a plaintiff or, as in this case, by a decedent is always
uncertain, and must be left largely to the judgment and discretion of the jury.  See
McIver v. Gloria, 169 S.W.2d 710, 711 (Tex. 1943).  

          Future, unrealized events may be
relevant to a jury’s determination of a decedent’s lost future income.  For example, courts have admitted evidence in
wrongful death actions
to show that the deceased intended to change occupations or may have been
promoted in the future.  See,
e.g., Douglass v. Delta Air Lines, Inc., 897 F.2d 1336, 1343 (5th Cir. 1990) (concluding that trial court
properly included decedent’s likely career advancement within the calculus to
determine lost earnings); Borak v. Bridge,
524 S.W.2d 773, 776–77 (Tex. Civ. App.—Corpus Christi 1975, writ ref’d n.r.e.)
(concluding that evidence that deceased student would pursue banking career is
admissible); Bell Aerospace Corp. v.
Anderson, 478 S.W.2d 191, 200 (Tex. Civ. App.—El Paso 1972, writ ref’d
n.r.e.) (deciding that future earning potential of deceased Army major with
projected advancement through officer ranks is admissible).

          Neither the parties’ nor our own
research reveals any published Texas opinion in which a court determined
whether evidence of a plaintiff’s illegal immigrant status is relevant to the
issue of future lost income.  To support
their relevancy argument, appellants rely on a 1972 unpublished opinion from
San Antonio.  The case is ABC Rendering of San Antonio, Inc. v.
Covarrubias, No. 15085, 1972 Tex. App. Lexis 2794 (Tex. Civ. App. 1972, no
writ) (not designated for publication).  

          In Covarrubias,
the plaintiff sought damages for the loss of past and future earning capacity.  Id. at
*4. 
The defendant challenged the trial court’s exclusion of evidence showing
that the plaintiff had entered the United States illegally.  Id. at
*16. 
Plaintiff’s expert testified to the value of the plaintiff’s lost
earnings based on what the plaintiff would have earned in the United States
over his life expectancy.  Id. at *17.  To rebut the plaintiff’s expert, the defense
offered evidence that the plaintiff had entered the United States
illegally.  Id. at *16.  The trial court excluded the immigration
evidence, and the defendant appealed.  Id.  The
San Antonio Court of Appeals reversed and remanded the case for a new trial.  Id. at *17.  In support of its holding,
the Covarrubias court reasoned, “The
fact that plaintiff was subject to immediate deportation to a drastically lower
standard of earnings would have an effect on his future earning capacity.”  Id.  The court held that if evidence exists “as to
the anticipated future earnings of a laborer in the United States, the jury
should be permitted to consider the effect of the plaintiff’s illegal entry
upon [these] future earnings.”  Id.  

We agree
with Covarrubia that immigration
status can be a relevant consideration.  See id.; see also Salas v. Hi-Tech Erectors, 168 Wash.2d 664, 670, 230 P.3d
583, 585–86 (2010); Rosa v. Partners in
Progress, Inc., 152 N.H. 6, 15, 868 A.2d 994, 1002 (2005) (concluding that “an
illegal alien’s status, though irrelevant to the issue of liability . . . is
relevant on the issue of lost earnings”); Melendres
v. Soales, 105 Mich. App. 73, 78, 306 N.W.2d 399, 402 (1981) (explaining
that “plaintiff’s status as an illegal alien was clearly irrelevant on the
question of liability, [but] it was material and relevant to the issue of
damages, specifically the present value of future lost earnings”); but see Clemente v. California, 40
Cal.3d 202, 221, 707 P.2d 818, 829, 219 Cal. Rptr. 445, 456–57, (1985) (“[T]here
was no evidence that [the plaintiff] had any intention of leaving this country
and the speculation that he might at some point be deported was so remote as to
make the issue of citizenship irrelevant to the damages question.”).  We conclude that appellants’ evidence of
Gomez’s illegal status is relevant because it has a tendency to make the
existence of the fact that Gomez would have continued to earn $33,000 per year
in the United States for the remainder of his working lifetime less probable
and to make the fact that he would have earned his wages in El Salvador more
probable.  See Tex. R. Evid.
401.  

2.       Balancing
Probative Value against Prejudicial Effect

          Although relevant, a trial court may
exclude evidence if its probative value is substantially outweighed by the
danger of unfair prejudice, confusion of the issues, or misleading the jury.  See
Tex. R. Evid. 403; Mayhew v. Dealey, 143 S.W.3d 356, 370
(Tex. App.—Dallas 2004, pet. denied) (explaining that, in making Rule 403
determination, trial court balances probative value of evidence against its
potential for unfair prejudice or confusion). 
As mentioned, appellees objected at trial to the evidence of Gomez’s
illegal status on the basis that it was highly prejudicial, citing Rule of
Evidence 403.  Appellants have not shown
that the trial court abused its discretion by excluding the subject evidence
based on Rule 403. [3]

          In TXI
Transportation Co. v. Hughes, the Supreme Court of Texas determined that
admitting evidence of a defendant’s illegal immigrant status for purposes of
impeachment and to aid in the plaintiff’s establishment of negligent hiring and
negligent entrustment was harmful error requiring reversal and retrial.  306 S.W.3d 230, 243–44 (Tex. 2010).  As part of its analysis, the court wrote,
“Even assuming the immigration evidence had some relevance, its prejudicial
potential substantially outweighed any probative value.”  Id. at
244.  The court noted, “Even in instances
where immigration may have limited probative value as to credibility, courts
have held that such evidence is properly excluded for undue prejudice.”  Id.  As examples, the Hughes court chose several opinions in which courts held that any
probative value that evidence of illegal immigrant status may have with respect
to the issue of future income damages is outweighed by the prejudicial effect
of the immigration evidence.  See id. at n.8 (citing, inter alia, Clemente v. State, 40 Cal.3d 202, 707 P.2d 818, 829, 219 Cal. Rptr.
445 (1985) (holding illegal immigrant status, “even if marginally relevant [on
damages issues], was highly prejudicial”); Klapa
v. O & Y Liberty Plaza Co., 168 Misc.2d 911, 913, 645 N.Y.S.2d 281, 282
(N.Y. Sup. Ct. 1996) (precluding “evidence which would indicate a plaintiff’s
immigration status,” because “whatever probative value illegal alien evidence
may have [as to damage calculations] is far outweighed by its prejudicial
impact”); Gonzalez v. City of Franklin,
137 Wis.2d 109, 139–40, 403 N.W.2d 747, 759–60 (1987) (affirming exclusion of
illegal alien status, which had only “speculative or conjectural” relevance to
damage issues but carried “obvious prejudicial effect”)).

          Other
courts have also held that evidence of a plaintiff’s illegal immigrant status
should be excluded based on its unfairly prejudicial effect when future lost
earnings are at issue.  See, e.g., Salas, 168 Wash.2d at
672, 230 P.3d at 587 (holding, “we are convinced that the probative value of a
plaintiff’s undocumented status, by itself, is substantially outweighed by the
danger of unfair prejudice”); Petersen
v. Neme¸ 222 Va. 477, 483, 281 S.E.2d 869, 872 (1981) (affirming trial
court’s decision to exclude evidence of plaintiff’s illegal immigrant status
offered to rebut future lose wage claim, noting that such evidence is “uniquely
prejudicial” and that “the trial court properly could conclude that the
prejudicial impact of the proffered evidence outweighed its probative value”); but see Rosa, 152 N.H. at 15, 868 A.2d
at 1002 (concluding that, although evidence of illegal immigrant status is
prejudicial, such evidence is essential to claim for lost earning capacity
measured at United States wage rates).  

          Although the fact finder has
discretion when determining an award of future income, see McIver, 169 S.W.2d at 711, that discretion is limited and must have
evidentiary support.  Thomas, 290 S.W.3d at 454; see Saenz
v. Fid. & Guar. Ins. Underwriters, 925 S.W.2d 607, 614 (Tex. 1996) (explaining
that “[j]uries cannot simply pick a number and put it in the blank”).  Courts have cautioned that pecuniary loss
damages should not be influenced by passion or prejudice.  See Samco
Properties, Inc. v. Cheatham, 977 S.W.2d 469, 480 (Tex. App.—Houston [14th
Dist.] 1998, pet. denied) (citing Louisiana
& A. Ry. Co. v. Chapin, 225 S.W.2d 614, 616 (Tex. Civ. App.—Texarkana
1949, writ ref’d)).  

          Undeniably, the issue of immigration
is a highly charged area of political debate. 
As a result, a trial court is prudent to weigh carefully evidence
revealing a plaintiff’s illegal immigrant status against the probative value of
such evidence.  The probative value of evidence showing only that the plaintiff is
an illegal immigrant, who could possibly be deported, is slight because
of the highly speculative nature of such evidence.  See
id.  Without a showing that a
plaintiff will likely be deported in his working lifetime, the jury is invited
to engage in conjecture and speculation regarding whether he will be deported,
when he will be deported, and, if deported, whether he will return to the
United States to work.  As a result, the
probative value of evidence concerning a plaintiff’s illegal immigrant status
is low, while the prejudicial effect of this evidence is high.  See id.  Appellants contend that their bill of
exception contained evidence showing more than a possibility that Gomez would
have been deported; that is, they assert that they offered evidence beyond
Gomez’s simple status as an illegal immigrant. 
In this regard, appellants point
to Bradshaw’s testimony in their bill of exception in which Bradshaw described
the federal immigration ICE raid conducted two weeks after Gomez’s death.  Appellants assert that this testimony was
evidence from which the jury could have reasonably inferred that Gomez would
have been deported in the near future.  

          While we are sensitive to a defendant’s need to rebut a
plaintiff’s damages evidence, a defendant must do so with competent evidence,
not with speculative evidence. 
Bradshaw’s testimony regarding the immigration raid comes no closer to
establishing that Gomez would likely have been deported than his illegal
immigrant status alone.  The information
necessary for the jury to reach such a finding is lacking from Bradshaw’s
testimony.  Bradshaw’s testimony that 50
to 55 employees were detained by federal authorities, due to “mismatched”
paperwork, offers little to guide the jury to find that, had he lived, Gomez
also would have been detained.  

          Bradshaw’s
testimony that approximately 30 of the 50 to 55 detained employees never
returned to Republic, including one employee who abandoned his van there, does
not, without engaging in speculation and conjecture, rise to the conclusion
that Gomez would have been deported, even if he had been detained.  

          The
probative value of Bradshaw’s bill of exception testimony was slight because of
its speculative nature.  At the same
time, the prejudicial effect of the evidence was great.  As a result, the trial court could have
properly concluded that Bradshaw’s bill of exception testimony did not survive
the balancing test under Rule 403.

          We
note that the scale may have tipped in favor of appellants with respect to the
Rule 403 balancing test had certain evidence, aside from the illegal status
evidence, been presented at trial.  For
instance, had evidence been presented at trial showing that Gomez was the
subject of a deportation proceeding or had been detected by federal immigration
authorities, the probative value of the illegal status evidence may have
outweighed its prejudicial effect.

          In
addition, appellees did not claim or offer evidence that Gomez’s wages would
have escalated or that he would have received a promotion in his employment had
he lived.  Rather, appellees’ damages
calculations were based on Gomez’s past income stream, i.e., the amount he was
earning at the time he was killed on the job. 
Again, the evidentiary ruling in this case may have been different had
such evidence or arguments been advanced by appellees.  However, that is not the record before us.

          Importantly,
the jury had before it ample evidence regarding Gomez’s immigration
status.  This evidence served to lessen
the probative value of appellants’ evidence regarding Gomez’s illegal status.  

          The
jury heard that 21-year-old Gomez and his wife had recently emigrated from El
Salvador.  The evidence showed that Gomez
and his wife had immediate family, including Gomez’s father, who still lived in
El Salvador.  From such evidence, the
jury could have deduced that Gomez may have returned to El Salvador had he
lived.  The jury also heard that Gomez
had earned $1,000 per year working in El Salvador.  McCoin testified that Gomez would have earned
$28,800 if he had returned to El Salvador to work the remainder of his working
lifetime.  The jury was free to factor
this evidence into its damages calculation. 


          Lastly,
we note that the trial court’s decision to exclude the evidence regarding
Gomez’s illegal immigrant status is in line with principles espoused elsewhere
in Texas law.  For example, Texas courts
have rejected a defendant’s claim that an undocumented worker should be
precluded from recovering damages for lost future earning capacity because of
his illegal status.  See, e.g., Tyson Foods, Inc. v. Guzman, 116 S.W.3d 233, 244 (Tex.
App.—Tyler 2003, no pet.); Wal-Mart
Stores, Inc. v. Cordova, 856 S.W.2d 768, 770 n.1 (Tex. App.—El Paso 1993,
writ denied).  In addition, section 406.092(a) of
the Texas Labor Code provides that a resident or nonresident alien employee is
entitled to compensation under the Workers Compensation Act.  Tex.
Lab. Code Ann. § 406.092(a) (Vernon 2006).  In other words, illegal workers are treated
the same as legal workers for purposes of asserting a workers’ compensation
claim in Texas.  See id.

          To
summarize, the evidence concerning Gomez’s illegal status is of some relevance
to the determination of Gomez’s lost future income.  However, the probative value of the ICE raid,
as well Gomez’s illegal immigrant status, was slight given the speculative
nature of the evidence sought to be admitted and the ample evidence that was
admitted about Gomez’s immigration status. 
Simply put, the usefulness of the evidence was limited given what other
evidence was, and was not, admitted in this case.  

          Had
the illegal immigrant status evidence been admitted, the jury would have been
required to essentially guess whether Gomez would ever have been deported.  Simultaneously, the prejudicial effect of
revealing that Gomez was an illegal immigrant would be great and outweighs the
probative value of the evidence.  In
short, the record supports the trial court’s determination that the illegal
status evidence was inadmissible under Rule 403.[4]  

          In
the end, we come back to the principle that the decision to admit or to exclude
evidence is committed to the trial court’s sound discretion.  The trial court is left to exercise that
discretion by applying the law to the evidence presented in each case before
it.  Although the rules of evidence
always govern, the evidentiary decisions made after applying those rules will
vary from case to case.     

          Absent
a showing on appeal that the trial
court acted without reference to any guiding rules and principles, or acted
arbitrarily and unreasonably, we must uphold a trial court’s decision to admit
or to exclude evidence.  Here, appellants
have made no such showing.  Thus, we
conclude that, under the circumstances of this case, it was within the trial
court’s discretion to exclude the evidence concerning Gomez’s illegal immigrant
status.  

          We
overrule appellants’ sole issue.

Conclusion

          We affirm the judgment of the trial
court.  

 

 

                                                                   Laura
Carter Higley

                                                                   Justice


 

Panel consists of Justices Keyes, Higley, and Bland.











[1]
          In the jury charge, “pecuniary
loss” was defined as “the loss of the care,     maintenance,
support, services, advice, counsel, and reasonable contributions of a   pecuniary value, excluding loss of
inheritance, that [the plaintiff] in reasonable      probability would have received from Oscar Gomez had he lived.”





 

[2]
          Appellants emphasize that their
complaint is not that appellees are
precluded from recovering damages for Gomez’s lost future income because of his
illegal immigration status.  A number of
courts have determined that an undocumented worker is entitled to recover damages
for lost future wages in a common-law personal injury action.  See,
e.g., Tyson Foods, Inc. v. Guzman, 116 S.W.3d 233, 244 (Tex. App.—Tyler
2003, no pet.) (rejecting defendant’s claim that undocumented immigrant worker
should be precluded from recovering damages for lost future earning capacity); Wal-Mart Stores, Inc. v. Cordova, 856
S.W.2d 768, 770 n.1 (Tex. App.—El Paso 1993, writ denied) (“The current state
of Texas law does not require citizenship or the possession of immigration work
authorization permits as a prerequisite to recovering damages for loss of
earning capacity, nor will this Court espouse such a theory.”); see also Balbuena v. IDR Realty, LLC, 6
N.Y.3d 338, 357, 845 N.E.2d 1246, 1256, 812 N.Y.S.2d 416, 426 (2006); Rosa v. Partners in Progress, Inc., 152
N.H. 6, 14, 868 A.2d 994, 1001(2005); but
see Veliz v. Rental Serv. Corp. USA, Inc., 313 F.Supp.2d 1317, 1337 (M.D. Fla.
2003) (concluding that policy underlying federal immigration law precludes
recovery of projected future U.S. wages in a tort action).  

 





[3]
          Appellants assert that the
judgment cannot be affirmed on Rule 403 grounds because the trial court granted
appellees’ in limine request based relevancy grounds.  Because the law is clear, we disagree.  Following the presentation of evidence in
each bill of exception, appellees asserted a Rule 401 relevancy objection and a
Rule 403 prejudice objection.  We must uphold the
trial court’s evidentiary ruling if there is any legitimate basis in the record
for the ruling.  See Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43
(Tex. 1998).  If it was within the trial
court’s discretion to exclude the evidence based on Rule 403 grounds, then we
must affirm the judgment.  See id.





[4]           We note that in Covarrubia, authority relied on by appellants, the court did not
conduct a Rule 403 analysis; that is, it did not determine whether the
probative value of the illegal status evidence was substantially outweighed by
the danger of unfair prejudice, confusion of the issues, or misleading the
jury.  See ABC Rendering of San Antonio, Inc. v.
Covarrubias, No. 15085, 1972 Tex. App. Lexis 2794, at *17 (Tex. Civ. App. 1972, no
writ) (not designated for publication).