[PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12717
_____

D.C. Docket No. 3:11-cr-00098-TJC-TEM-3


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTOUN CHAHLA,
FADI CHAHLA,
MOWAFAK SHAHLA,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(May 21, 2014)

Before MARTIN and DUBINA, Circuit Judges, and DUFFY,[*] District Judge.

MARTIN, Circuit Judge:

Mowafak, Antoun, and Fadi Chahla[1] are brothers from Syria. The Chahla brothers married two sisters, Victoria and Genetta Knight, as well a third woman, Brenda Pettit, who was (intermittently) related to Victoria and Genetta by way of her marriage to their brother. The government charged them all with fraudulently entering into these marriages for the purpose of allowing the brothers to gain more favorable immigration status. A jury convicted each of the three brothers of: (1) conspiracy to commit offenses against the United States and to defraud the United States (18 U.S.C. §§ 371, 1001, and 8 U.S.C. § 1325(c)), and (2) unlawful procurement of citizenship or naturalization (18 U.S.C. § 1425(a))—all based on evidence of marriage fraud. This appeal followed. In addressing their appeal, we consider the brothers' challenge to the sufficiency of the evidence on all counts; the District Court's failure to give three theory-of-defense jury instructions; and the denial of their motion for a mistrial. After review and with the benefit of oral argument, we affirm.

---

[*] Honorable Patrick Michael Duffy, United States District Judge for the District of South Carolina, sitting by designation.

[1] Mowafak spells his last name "Shahla," rather than Chahla. For simplicity, we will refer to the three defendants collectively as the Chahlas.

2

## I. FACTUAL AND PROCEDURAL BACKGROUND

In reviewing the sufficiency of the evidence after a criminal conviction, we view the evidence in the light most favorable to the government. United States v Isnadin, 742 F.3d 1278, 1303 (11th Cir. 2014). This account reflects that view.

### A. Mowafak's Marriage

Mowafak came to the United States in 1995. In 1998 he was ordered to appear at removal proceedings because he had been convicted of a crime unrelated to this case. He approached Victoria Knight, who shopped regularly at a store he owned. Mowafak told her he was having immigration problems and might be deported. He asked Victoria if she would help him with his immigration troubles by marrying him. Victoria eventually agreed and they were married. However, Victoria and Mowafak never lived together. Indeed, about a month after they married, Victoria began dating Robert Vonshmidt, and she maintained her relationship to Mr. Vonshmidt throughout her marriage to Mowafak.

After she married Mowafak, Victoria filed an I-130 petition to sponsor his adjustment of status to become a Lawful Permanent Resident.[2] Mowafak also filed a Form I-485 application to adjust his status based on his marriage to Victoria.

---

[2] When a non-citizen marries a U.S. citizen, the citizen spouse can file a Form I-130 Petition for Alien Relative to allow the non-citizen spouse to adjust his or her immigration status. See 8 U.S.C. § 1154(a)(1)(A)(i); 8 C.F.R. § 204.1(a)(1). Then the alien spouse submits a Form I-485 Application to Adjust Status, which is an application to become a Lawful Permanent Resident. 8 U.S.C. § 1255(i); 8 C.F.R. § 245.1. For an alien spouse who is outside of the United States, he or she completes a visa package, which includes the State Department's version of the Form I-485, and presents it when entering the United States.

Victoria and Mowafak went to interviews with immigration officials in support of Mowafak's application. They submitted photographs to show their marriage was bona fide. Mowafak told Victoria that immigration might ask questions about whether they really lived together and if they were happy to ensure they were not lying and that they were a "legal couple." Mowafak paid Victoria $200 a month for a year and reimbursed her for lost wages when she attended appointments with immigration officials. In April 2002 they appeared before an immigration judge. Victoria testified in support of Mowafak and the judge granted his application for a waiver of his previous conviction and adjusted his status to become a Lawful Permanent Resident.

After the hearing, Victoria rarely saw Mowafak. Several months after he received his Lawful Permanent Resident status, Mowafak traveled to Syria and married a Syrian woman named "Mary." Mowafak and Victoria were formally divorced in December 2005. Mowafak later applied for citizenship in July 2007, indicating he was eligible because he had been a Lawful Permanent Resident for at least five years.[3]

---

[3] A person who has become a Lawful Permanent Resident by marrying a U.S. citizen can later apply for citizenship in one of two ways. If the foreign spouse is still married to the citizen spouse, he or she can apply for citizenship after being married and having Lawful Permanent Resident status for three years. 8 U.S.C. § 1430(a). If the marriage has ended, the foreign spouse can apply for citizenship after being a Lawful Permanent Resident for five years. 8 U.S.C. § 1427(a). Either way the foreign spouse completes a Form N-400. See 8 U.S.C. § 1445(a); 8 C.F.R. § 334.2.

4

## B.  Antoun's Marriage

In 2002 Raymond Knight told his (and Victoria's) sister, Genetta, that there was a man who needed to become a citizen and needed Genetta to marry him. Shortly afterwards Antoun Chahla came to the United States on a student visa.  He and Genetta were married about three weeks later.  Almost immediately after the ceremony, Antoun left for Paris, and stayed for eight to nine months without Genetta.

After they were married, Genetta submitted a Form I-130 on Antoun's behalf and Antoun filed the corresponding I-485 application to adjust his status to become a Lawful Permanent Resident.  In June 2006 Mowafak sent a letter to U.S. Citizenship and Immigration Services claiming that he had been renting a house to Antoun and Genetta.  But Genetta and Antoun never lived together.  Genetta met with immigration officers twice to help Antoun.  Antoun received permanent resident status in July 2006.  He completed a Form N-400 to apply for citizenship three years later.

## C.  Fadi's Marriage

In 2000 or 2001, Brenda Pettit began dating Raymond Knight.  A few years later, Raymond and Mowafak asked Brenda to marry the third Chahla brother, Fadi.  Brenda eventually agreed to go to Syria to become engaged to Fadi and apply for a fiancé visa.  Mowafak made all the arrangements, including travel, and

5

directed Brenda's activities in Syria. Mowafak and Fadi took Brenda to a meeting with U.S. officials where she told them that she and Fadi were engaged and she wanted to bring him to the United States. In truth, Brenda had no romantic feelings for Fadi. Mowafak paid Brenda $500 before the trip and $500 afterward. After Brenda returned to the U.S. she wrote two letters to Fadi at Mowafak's direction. At trial Brenda testified that the statements in the letters—such as that she missed Fadi, that she wished she was there with him, that he was her love— were not true. Fadi's fiancé visa application was eventually denied.

After her trip to Syria, Brenda and Raymond got married. But Raymond continued to talk to Brenda about finishing what they had started with Fadi. Eventually Brenda agreed. Mowafak said he would pay her $1000 when she went to Syria to marry Fadi and then $1000 when she got back. Mowafak also paid the expenses related to Brenda's divorce from Raymond.

After she and Fadi were married in Syria, Brenda submitted a Form I-130 on Fadi's behalf. Fadi entered the United States in October 2006 and was given conditional status as a Lawful Permanent Resident. Mowafak began paying Brenda $300 a month for assisting Fadi with additional immigration matters. Later Brenda and Fadi filed a Form I-751 to remove the conditions from Fadi's residency.

6

In September 2009 Fadi applied for naturalization as Brenda's spouse.  Just shy of a year later, Fadi and Brenda divorced.  Because of the divorce, Fadi withdrew his naturalization application.  Brenda then resumed her marriage to Raymond when she remarried him in January 2011.

### D.  Investigation and Indictment

At some point in or before 2008, federal officials began investigating the brothers' marriages.  While the investigation was underway, Fadi continued to move forward with his immigration proceedings.  But unknown to him, Brenda began cooperating with federal officials and she recorded a number of conversations she had with Mowafak and Fadi leading up at an immigration interview for Fadi that she was also to attend.  These conversations showed Mowafak directing her and Fadi's preparations.  Antoun also participated in one of the meetings.

Mowafak, Antoun, and Fadi were indicted in April 2011 in a seven-count indictment.  The charges included (a) one count of conspiracy to commit offenses against the laws of the United States and to defraud the United States, which was made against all three brothers, under 18 U.S.C. §§ 371 and 1001, and 8 U.S.C. § 1325(c); and (b) six counts of unlawful procurement of naturalization, two apiece for each brother individually, under 18 U.S.C. § 1425(a).  For Mowafak and Antoun, one of the unlawful procurement of naturalization charges was based on

false statements made on his application to become a Lawful Permanent Resident and the other was based on false statements made on his naturalization application. Fadi's unlawful procurement charges were based on his original Lawful Permanent Resident application and his later petition to remove the conditions from his Lawful Permanent Resident status (Form I-751).

The Chahlas pleaded not guilty and were tried before a jury in January and February 2013. The jury convicted all three Chahla brothers on the six remaining counts of the indictment.[4] The Chahlas moved for a judgment of acquittal on all Counts at the close of the government's case and again at the close of all evidence. After the verdict, the Chahlas filed briefs to renew their motions for judgment of acquittal or alternatively request a new trial, which the District Court denied. The Chahlas then filed this appeal.

## II.  DISCUSSION

### A.  Sufficiency of the Evidence

"We review de novo a District Court's denial of judgment of acquittal on sufficiency of evidence grounds, considering the evidence in the light most favorable to the Government, and drawing all reasonable inferences and credibility choices in the Government's favor." United States v. Capers, 708 F.3d 1286,

---

[4] Before trial the government dismissed Count 6, which had charged Fadi with unlawful procurement of naturalization based on false statements made on his initial application to become a Lawful Permanent Resident.

1296–97 (11th Cir. 2013).  "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Herrera, 931 F.2d 761, 762 (11th Cir. 1991).  "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." United States v. Poole, 878 F.2d 1389, 1391 (11th Cir. 1989).

1.  Count 1

The Chahlas argue that the District Court should have granted their motion for acquittal on Count 1 because the evidence at trial actually established multiple conspiracies—one for each fraudulent marriage—rather than the single conspiracy charged in the indictment.  But the record does not support the Chahlas' argument. Indeed, the District Court instructed the jury that "[p]roof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment" and explained the circumstances in which the jury must find the Chahlas not guilty.  The parties also argued their respective positions in their closing arguments to the jury.  Because the jury was properly instructed and heard arguments in support of each position, "the convictions of the defendants are implicit findings that the evidence proved the existence of the single conspiracy alleged." United States v. Jones, 913 F.2d 1552, 1561 (11th Cir. 1990) (quotation

9

marks omitted). The jury's verdict was also supported by significant evidence of an overall conspiracy with the common goal of faking marriages in support of applications for legal immigration status for the three brothers.[5] See United States v. Edouard, 485 F.3d 1324, 1347 (11th Cir. 2007) (noting the jury's "determination will not be disturbed if supported by substantial evidence" (citation omitted)). We therefore affirm the Chahlas' conviction on Count 1.

2. Counts 2, 3, and 5

The Chahlas also say that three of their convictions under 18 U.S.C. § 1425(a), for unlawful procurement of naturalization and citizenship, cannot rightly stand because these Counts relied on the false statements they made in support of their applications to become Lawful Permanent Residents. Section 1425, entitled "[p]rocurement of citizenship or naturalization unlawfully," criminalizes "knowingly procur[ing] or attempt[ing] to procure, contrary to law, the naturalization of any person." 18 U.S.C. § 1425(a) (emphasis added). The

---

[5] Even if there were multiple conspiracies, the record does not establish, and the Chahlas do not claim, that they were prejudiced by a variance between the conspiracy charged and that presented at trial. Edouard, 485 F.3d at 1348 (affirming conspiracy conviction because "even if a variance had occurred . . . [the defendant's] claim still fails because he has not shown that he suffered substantial prejudice as a result"). There was significant evidence of both Antoun and Fadi's fraudulent marriages and conspiracies with Mowafak, such that the Chahlas cannot claim they were prejudiced by spillover. See United States v. Alred, 144 F.3d 1405, 1415 (11th Cir. 1998) (noting prejudice can be shown where "there is a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another" (citation omitted)). Nor can the Chahlas claim the proof at trial differed so greatly from the conspiracy charged that they were unfairly surprised or unable to prepare an adequate defense. Id.; see also Edouard, 485 F.3d at 1348.

Chahlas emphasize that their convictions on Counts 2, 3 and 5 should be reversed because § 1425(a) criminalizes fraudulent procurement of naturalization, but not false statements made in applications to adjust to permanent residence.[6] In support of their argument they point out, and the government concedes, that a person could become a Lawful Permanent Resident and never seek to become a citizen. Because we conclude that neither the law, nor the facts, supports the Chahlas' position, we reject their argument.

First, there are very few cases analyzing § 1425. At least one court has affirmed a conviction under 18 U.S.C. § 1425(b) based on fraudulent statements made on a Lawful Permanent Resident application, although with no analysis of the issue presented by the Chahlas. See, e.g., United States v. Alameh, 341 F.3d 167, 172 (2d Cir. 2003); see also United States v. Alferahin, 433 F.3d 1148, 1151–52 (9th Cir. 2006) (reversing on other grounds a conviction under § 1425(a) that was based on inaccurate information provided with Lawful Permanent Resident application). Instead, the parties point us to two Supreme Court cases interpreting the statute for revoking naturalization, 8 U.S.C. § 1451, to argue their positions:

---

[6] It appears that the government charged the Chahlas under 18 U.S.C. § 1425(a) instead of the statute generally used to prosecute marriage fraud, 8 U.S.C. § 1325(c), because the statute of limitations for the latter had run. Compare 18 U.S.C. § 3291 (providing a ten-year statute of limitations for violations of § 1425) with 18 U.S.C. § 3282(a) (establishing a five-year statute of limitations for statutes, like § 1325, that do not provide otherwise).

11

Fedorenko v. United States, 449 U.S. 490, 101 S. Ct. 737 (1981), and Kungys v. United States, 485 U.S. 759, 108 S. Ct. 1537 (1988).

Although Fedorenko and Kungys address a different statute, they establish a principle that counsels against the interpretation urged on us by the Chahlas. First, in Fedorenko, the Supreme Court reaffirmed the principle that "there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship" and "[f]ailure to comply with any of these conditions renders the certificate of citizenship illegally procured." 449 U.S. at 506, 101 S. Ct. at 747 (internal quotation marks omitted). Based in part on this principle, the Supreme Court affirmed a denaturalization decision where the petitioner made misrepresentations to obtain a visa to enter the United States, for which he otherwise would not have been eligible. Id. at 513–14, 101 S. Ct. at 750–51. In its conclusion the Supreme Court said:

> [P]etitioner was inadmissible into this country under the express terms of the [displaced person visa program]. Accordingly, inasmuch as petitioner failed to satisfy a statutory requirement which Congress has imposed as a prerequisite to the acquisition of citizenship by naturalization, we must agree with the Government that petitioner's citizenship must be revoked because it was "illegally procured."

Id. at 515, 101 S. Ct. at 752; see also United States v. Arango, 670 F.3d 988, 993 n.2 (9th Cir. 2012) (denaturalization case citing Fedorenko and noting, "If Arango was not a lawful permanent resident at the time of his naturalization because of his fraudulent marriage, then his citizenship was illegally procured.").

12

Although Fedorenko was a denaturalization case, its reasoning is instructive here. There is no dispute that, for the Chahlas, becoming a Lawful Permanent Resident was a statutory prerequisite to their becoming naturalized citizens. 8 U.S.C. §§ 1427(a), 1430(a). Certainly, there is also evidence that the Chahlas became Lawful Permanent Residents through fraudulent marriages. Fedorenko therefore suggests that the Chahlas' attempt to become naturalized citizens was "contrary to law" to the extent it was based on their fraudulently obtained status as Lawful Permanent Residents.

The Supreme Court's later decision in Kungys also suggests this outcome. In applying the denaturalization statute, the Court found it improper to consider misrepresentations made in Kungys's visa proceeding. Kungys, 485 U.S. at 773, 108 S. Ct. at 1547–48. But the Court's conclusion was based on the "concealment or misrepresentation" clause of the denaturalization statute.[7] Id. at 773, 108 S. Ct. at 1547 ("[T]he 'concealment or misrepresentation' clause of § 1451(a) applies only where the 'order and certificate of naturalization . . . were procured by concealment of a material fact or by willful misrepresentation.'"). Qualifying its interpretation of § 1451(a), the Court, citing Fedorenko, expressly noted that whether Kungys's unlawful procurement of a visa would have led, in turn, to his

[7] Section 1451(a) provides that it is the duty of U.S. attorneys to seek revocation of citizenship "on the ground that such order and certificate of naturalization were [1] illegally procured or [2] were procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a).

13

illegal procurement of naturalization "is a quite different question." Id. at 774 n.8, 108 S. Ct. at 1548 n.8.

Certainly, Fedorenko and Kungys are not controlling. But Fedorenko establishes the persuasive principle that naturalization is unlawfully procured where a statutorily-required intermediate immigration status was obtained by fraud. This principle seems to have been underscored in Kungys when the Supreme Court expressly set aside the question of whether unlawful procurement of a statutorily-required intermediate immigration status would cause a later naturalization to be illegally procured. Id. Based on the persuasive authority of Fedorenko and Kungys, we conclude that a conviction under 18 U.S.C. § 1425(a) for unlawful procurement of citizenship may be based on fraudulent statements made to obtain statutorily-required Lawful Permanent Resident status.[8]

Second, in response to the Chahlas' argument going to the particular facts of their case, we recognize there could be another case with different facts, in which false statements made to become a Lawful Permanent Resident might not have a sufficient nexus with an attempt to naturalize, so as to support a conviction under § 1425(a). Cf. Alferahin, 433 F.3d at 1154–55 (discussing the materiality

---

[8] We note that the Chahlas have not asked us to review—and thus we express no opinion as to—whether the government over-reached by seeking two separate convictions against Mowafak and Antoun for unlawful procurement of naturalization based, respectively, on false statements made to become a Lawful Permanent Resident and false statements made on their naturalization applications.

14

requirement of § 1425(a)).  It is certainly true—as both sides concede—that a person who becomes a Lawful Permanent Resident may never apply for citizenship.  But we need not decide the outer limits of § 1425 here.  This is not a case, for example, where the defendant never applied for citizenship or where there was a large gap in time between an application to become a Lawful Permanent Resident and a later attempt to naturalize.  Rather, all three Chahla brothers promptly filed naturalization applications and the evidence presented at trial was such that a reasonable jury could conclude that the Chahlas intended to seek naturalization, although they were not legally entitled, when they filed their fraudulent Lawful Permanent Resident applications.  Specifically, it was a short period of time in which each of the three brothers entered into their own fraudulent marriage and then quickly applied to become Lawful Permanent Residents based on these marriages.  They then sought to naturalize as soon as they were eligible.  Because there was sufficient evidence here that the Chahlas' fraudulent statements on their respective Lawful Permanent Resident applications were made with the intent to unlawfully procure naturalization, we affirm the convictions on Counts 2, 3 and 5.

3.  Counts 4 and 7

In challenging Counts 4 and 7, which also charged violations of § 1425(a) but for false statements made on their naturalization applications, Antoun and

15

Mowafak argue that the term "moral turpitude" on Form N-400 was unclear to them, making the evidence insufficient to support their convictions. Antoun also claims that Genetta Knight's recantation and testimony that their marriage was legitimate undermined the evidence and required acquittal.

Neither of these arguments has merit. First, the phrase "moral turpitude" does not appear on the Form N-400 that is at issue for these Counts. In any event, there was sufficient evidence for the jury to convict Antoun and Mowafak on Counts 4 and 7. On their Form N-400s, Antoun and Mowafak answered "no" to whether they had "ever given false or misleading information to any U.S. government official while applying for any immigration benefit to prevent deportation, exclusion, or removal" and whether they had "ever lied to any U.S. government official to gain entry or admission into the United States." Yet there was overwhelming evidence at trial that Mowafak and Antoun's marriages were fraudulent and that their answers to these questions were false.

Second, although Genetta Knight's testimony may have been contradictory and inconsistent, it is the job of the jury to evaluate the credibility of her testimony and compare it with her previous admissions that her marriage to Antoun was fraudulent. United States v. Hernandez, 433 F.3d 1328, 1334 (11th Cir. 2005) ("[W]e are bound by the jury's credibility determinations, and by its rejection of the inferences raised by the defendant." (citation omitted)).

16

Because a reasonable construction of the evidence would have allowed the jury to find Mowafak and Antoun guilty beyond a reasonable doubt on Counts 4 and 7, we affirm these convictions.

### B.  The Chahlas' Requested Jury Instructions

The Chahlas next contest the District Court's refusal to give three jury instructions, which they describe as "theory of defense" instructions.  "We review a district court's refusal to give a particular jury instruction for abuse of discretion."  United States v. Yeager, 331 F.3d 1216, 1222 (11th Cir. 2003) (citation omitted).  A criminal defendant has the right, separate and apart from instructions given on the elements of the charged offense, to a jury instruction on his theory of defense for which there exists sufficient evidence for a reasonable jury to find in his favor.  See Mathews v. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 887 (1988); United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995). "[T]he defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." United States v. Lively, 803 F.2d 1124, 1126 (11th Cir. 1986) (quotation marks omitted).

Our review of the record shows that the Chahlas did not present even "weak, insufficient, [or] inconsistent" evidence of a conspiracy solely with a government

17

agent, entrapment, or a perjury trap to support their requested instructions.

Therefore, the District Court did not abuse its discretion here.

### C.  Motion for Mistrial Based on Genetta Knight's Testimony

Finally, the Chahlas argue that the District Court erred by not declaring a mistrial or granting a new trial based on the testimony of Genetta Knight.  They say the government acted in bad faith by calling Genetta as a witness when it knew her testimony would conflict with her prior statements, which it would then try to admit as impeachment.  We review a decision not to grant a mistrial for abuse of discretion.  United States v. Emmanuel, 565 F.3d 1324, 1334 (11th Cir. 2009).

"[T]he government would have acted in bad faith if it had offered the testimony of [Genetta] knowing it to be useless, and thereafter eliciting the testimony for impeachment in the form of an inconsistent statement."  United States v. Billue, 994 F.2d 1562, 1566 (11th Cir. 1993).  But because that is not what happened here, we find no abuse of discretion in the District Court's denial of the Chahlas' motion for a mistrial.  Although Genetta changed some details of her story when she testified at trial, the government still used Genetta to elicit evidence of Antoun's false statements and facts tending to show their marriage was a fraud.  See United States v. DeLillo, 620 F.2d 939, 946 (2d Cir. 1980) (finding no bad faith where witness's "corroborating testimony was essential in many areas of the government's case").

18

## III.  CONCLUSION

There was sufficient evidence to support the brothers' convictions, and we find no error in the District Court's rulings on the jury instructions or motion for a mistrial.  The convictions of Mowafak Shahla, Antoun Chahla, and Fadi Chahla are therefore **AFFIRMED.**