ATTORNEYS FOR APPELLANT
Timothy F. Devereux
Daniel A. Ladendorf
Ladendorf Law
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
INDIANA CHAPTER OF THE AMERICAN
IMMIGRATION LAWYERS ASSOCIATION
Thomas R. Ruge
Joseph P. Rompala
Tabitha L. Balzer
Lewis & Kappes, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Rick D. Meils
Neil A. Davis
John W. Mervilde
Meils Thompson Dietz & Berish
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA TRIAL LAWYERS ASSOCIATION
Alexander Jesus Limontes
Law Office of William W. Hurst LLC
Indianapolis, Indiana



FILED
May 04 2017, 2:09 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# In the
# Indiana Supreme Court

---

### No. 54S01-1610-CT-546

NOE ESCAMILLA,

*Appellant (Plaintiff),*

v.

SHIEL SEXTON COMPANY, INC.,

*Appellee (Defendant).*

---

Appeal from the Montgomery Superior Court 1, No. 54D01-1107-CT-562
The Honorable Heather L. Dennison, Judge

---

On Petition to Transfer from the Indiana Court of Appeals, No. 54A01-1506-CT-602

---

**May 4, 2017**

**Rush, Chief Justice.**

Indiana's tort trials should be about making injured parties whole—not about federal immigration policies and laws. Today we address two important issues of first impression: May an unauthorized immigrant sue for decreased earning capacity damages in a tort action? And if so, is that plaintiff's unauthorized immigration status admissible at trial?

We first hold that the Indiana Constitution's Open Courts Clause allows unauthorized immigrants to pursue claims for decreased earning capacity damages. We then provide an evidentiary framework for determining when unauthorized immigration status is admissible. That framework recognizes that while a plaintiff's unauthorized immigration status is relevant to decreased earning capacity damages, admitting it would result in a collateral mini-trial on immigration—a mini-trial that brings significant risks of confusing the issues and unfair prejudice. Under Indiana Rule of Evidence 403, these risks will substantially outweigh immigration status's relevance—making it inadmissible—unless the evidence's proponent shows by a preponderance that the plaintiff will be deported. Finally, we hold that unaccounted-for contingencies in an expert's damages calculations are issues for cross-examination, not grounds for exclusion. We therefore reverse the trial court's contrary rulings and remand for it to apply this framework.

### Facts and Procedural History

When Noe Escamilla was injured on the job, he was an unauthorized immigrant working as a masonry laborer. About six years earlier, he had moved to the United States from Mexico as a teenager with his parents, later marrying Karina and having three children. His wife and children are all United States citizens.

In December 2010, Escamilla's employer, Masonry By Mohler,[1] assigned him to work on Wabash College's baseball stadium in Crawfordsville. Escamilla and his coworkers needed to lift a heavy capstone, but it rested on treacherous ground—rough with patches of snow and ice. As they tried to lift the stone, Escamilla slipped on the ice and fell, suffering a hernia and severely injuring his back. He now endures a permanent disability, restricting him from lifting more than twenty pounds and barring him from working again as a masonry laborer.

---

[1] The record shows that Escamilla provided a Mexican ID when he was hired, and paid United States taxes on his income. There is no indication that Masonry By Mohler used E-Verify or otherwise checked Escamilla's immigration status at any time before his injury. See U.S. Citizenship and Immigration Services, E-Verify, https://www.uscis.gov/e-verify.

Escamilla sued Shiel Sexton, the general contractor on the Wabash College project, for his injuries. Anticipating that lost wages and decreased earning capacity would be a major part of the suit, Escamilla retained Sara Ford, a vocational rehabilitation expert, and Ronald Missun, an economist, to provide expert testimony on these issues. Ford and Missun analyzed Escamilla's United States tax returns and work and income history, concluding that his average earnings were $26,270 in the five years before his injury and $38,237 in the two years before his injury. Ford and Missun then calculated that Escamilla's injury decreased his lifetime earning capacity by between $578,194 and $947,421.

Shiel Sexton filed a pre-trial motion, arguing that (1) Escamilla's immigration status should bar him from recovering his decreased earning capacity; (2) Escamilla's immigration status should be admissible because, as an unauthorized immigrant, he could be deported at any time; and (3) Ford and Missun's testimony should be excluded as unreliable for failing to account for Escamilla's immigration status. Escamilla countered with a motion in limine, asking the trial court to exclude any mention of his immigration status as irrelevant and unfairly prejudicial.

The trial court allowed evidence of Escamilla's immigration status and excluded Ford and Missun's testimony. It reasoned that "Escamilla's immigration status is relevant to the issue of damages on his claim for lost future income," and that the report improperly looked at wages in the United States, where Escamilla "is not legally permitted to work." After excluding that testimony, the court closed discovery, barring the parties from identifying additional expert witnesses or supplementing previous experts' testimony. Escamilla then took this interlocutory appeal, arguing that his immigration status carried far more risk of unfair prejudice than relevance and that Ford and Missun should be allowed to testify.

The Court of Appeals affirmed in a split decision. The majority held that Escamilla can recover decreased earning capacity damages, and that his immigration status would be relevant and admissible if he claimed lost United States wages and faced "any risk" of deportation. Escamilla v. Shiel Sexton Co., 54 N.E.3d 1013, 1022 (Ind. Ct. App. 2016). The majority also affirmed the exclusion of Ford and Missun's testimony for failing to consider Escamilla's immigration status. Id. at 1021. Judge Baker dissented, believing that the risk of unfair prejudice substantially outweighed any relevance to Escamilla's immigration status. Id. at 1025 (Baker, J., dissenting).

Escamilla petitioned for transfer, which we granted to address when immigration status is admissible in a decreased earning capacity tort claim—an issue of first impression. We reverse the trial court, provide a framework for addressing this evidentiary question under Rule 403, and remand for the trial court to apply this framework.

## Standard of Review

We review the trial court's evidentiary rulings for an abuse of discretion. State Farm Mut. Auto. Ins. Co. v. Earl, 33 N.E.3d 337, 340 (Ind. 2015). But to the extent the evidentiary rulings raise threshold constitutional questions, we apply de novo review. Tiplick v. State, 43 N.E.3d 1259, 1262 (Ind. 2015).

## Discussion and Decision

We first address the threshold issue of whether unauthorized immigrants can pursue a tort claim for decreased earning capacity damages. Then, we turn to this tort case's two evidentiary questions: (1) In a decreased earning capacity tort claim, when will the risks of confusing the issues and unfair prejudice substantially outweigh the probative value of unauthorized immigration status under Indiana Rule of Evidence 403? And (2) are expert calculations of decreased earning capacity damages inadmissible if they fail to account for some contingencies?

## I. Unauthorized Immigrants May Pursue Claims for Decreased Earning Capacity Damages.

Shiel Sexton argued to the trial court and Court of Appeals that Escamilla's immigration status bars him from recovering his decreased earning capacity. But blocking unauthorized immigrants from pursuing decreased earning capacity claims would violate the Open Courts Clause in Article 1, Section 12 of the Indiana Constitution—and federal law does not require us to hold otherwise.

*A. The Indiana Constitution's Open Courts Clause guarantees unauthorized immigrants access to Indiana courts to pursue decreased earning capacity claims.*

Indiana's Open Courts Clause mandates, "All courts shall be open; and *every person*, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; *completely*, and without denial; speedily, and without delay." Ind. Const. art. 1, § 12 (emphases added). This Clause thus

4

"guarantees access to the courts to redress injuries to the extent the substantive law recognizes an actionable wrong." Smith v. Ind. Dep't of Corr., 883 N.E.2d 802, 807 (Ind. 2008).

When Indiana law affords a remedy—like recovering decreased earning capacity—the Open Courts Clause does not permit us to close the courthouse door based solely on the plaintiff's immigration status. We cannot read the Open Courts Clause's "every person" guarantee to exclude unauthorized immigrants. See Plyler v. Doe, 457 U.S. 202, 210 (1982) ("Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term."); McKean v. Yates Eng'g Corp., 200 So. 3d 431, 436 (Miss. 2016) (holding that, regarding unauthorized immigrants and Mississippi's Open Courts Clause, "the Mississippi Constitution does not limit access to our courts and leaves open for *every person* a remedy for injury done to his person"); Arteaga v. Literski, 265 N.W.2d 148, 150 (Wis. 1978) (holding that Wisconsin's Open Courts Clause says "every person," so unauthorized immigrants "have the right to sue in the courts of the State of Wisconsin for personal injuries"). And as long as decreased earning capacity remains recoverable in personal injury actions, it is part of administering justice "completely." See Smith, 883 N.E.2d at 807 ("[The Open Courts Clause means], at a minimum, that to the extent the law provides a remedy for a wrong, the courts are available and accessible to grant relief.").[2] Accordingly, Escamilla and similarly situated plaintiffs cannot be barred from pursuing decreased earning capacity claims.

This "every person" mandate is rooted in the Open Courts Clause's history—going back to Chapter 40 of Magna Carta. That chapter provided in part, "to no one will we sell, to no one deny or delay right or justice." Id. at 806 (quoting William McKechnie, Magna Carta: A Commentary on the Great Charter of King John 395 (2d. ed. 1914)). Sir Edward Coke interpreted Chapter 40 this way:

> And therefore every Subject of this Realm, . . . be he Ecclesiastical, or Temporal, Free or Bond, Man or Woman, Old or Young, *or be he outlawed, excommunicated, or any other without exception*, may take his remedy by the course of the Law, and have justice and right for the injury done to him, freely without sale, *fully without any denial*, and speedily without delay.

---

[2] The United States Supreme Court has reached similar conclusions under, for example, the Fifth and Fourteenth Amendments. Plyler, 457 U.S. at 210 ("Aliens, even aliens whose presence in this country is unlawful, have long been . . . guaranteed due process of law by the Fifth and Fourteenth Amendments.").

Id. (emphasis added) (quoting David Schuman, Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution, 65 Or. L. Rev. 35, 38 (1986)). This formulation—which directly informed state Open Courts Clauses—shows that Indiana's Open Courts Clause does not play favorites. See Jonathan M. Hoffman, By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions, 74 Or. L. Rev. 1279, 1314 (1995). Our Constitutional history and foundation demonstrate that the Open Courts Clause applies in full force to unauthorized immigrants.

B. *The United States Supreme Court's* Hoffman *decision does not compel a different result.*

Shiel Sexton cites Hoffman Plastic Compounds, Inc. v. N.L.R.B., 535 U.S. 137 (2002) in arguing that unauthorized immigrants cannot recover their decreased earning capacities. In Hoffman, the United States Supreme Court addressed immigration status's effect on backpay awards under the National Labor Relations Act, reversing the National Labor Relations Board's backpay award to an unauthorized immigrant. Id. at 142. The majority reasoned that allowing the award would disrupt federal immigration policy under the Immigration Reform and Control Act of 1986 ("IRCA") because "it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies." Id. at 148–49.

Critically, though, Hoffman's issue—whether federal immigration law under IRCA limited remedies for National Labor Relations Act violations—was only about reconciling two *federal* statutes. Id. at 152. Hoffman thus "is a narrow decision that does not touch on state common law." Hugh Alexander Fuller, Comment, Immigration, Compensation, and Preemption: The Proper Measure of Lost Future Earning Capacity Damages After Hoffman Plastic Compounds, Inc. v. NLRB, 58 Baylor L. Rev. 985, 1002 (2006). It simply does not affect the recovery of decreased earning capacity damages, which are common-law damages under *state* tort law. See id. Accordingly, courts—including our Court of Appeals here—have consistently declined to expand Hoffman to decreased earning capacity cases. E.g., Escamilla, 54 N.E.3d at 1020 n.6; Balbuena v. IDR Realty LLC, 845 N.E.2d 1246, 1260 (N.Y. 2006); Rosa v. Partners in Progress, Inc., 868 A.2d 994, 1000 (N.H. 2005). And because Hoffman involved only federal congressional policy, it did not address the evidentiary issues governing this case.

In sum, Hoffman does not apply and Indiana's Open Courts Clause mandates that every person, including unauthorized immigrants, has access to our courts to pursue remedies. We thus

turn to the first of this case's central evidentiary questions: whether unauthorized immigration status is admissible evidence for decreased earning capacity calculations.

## II. The Admissibility of a Plaintiff's Unauthorized Immigration Status Is an Evidentiary Question, Resolved by Indiana's Relevance Rules.

Indiana's Rules of Evidence guide the admissibility of unauthorized immigration status. Most states with similar provisions find immigration status inadmissible because its dangers substantially outweigh its probative value.

### A. *Indiana's Rules of Evidence govern immigration status's admissibility.*

We focus on Indiana's relevance rules—Rules of Evidence 401, 402, and 403—to provide a framework for resolving when, in tort cases like this one, a plaintiff's unauthorized immigration status is admissible.

Rule 401 deems evidence relevant when it "has any tendency to make a [consequential] fact more or less probable than it would be without the evidence." Patchett v. Lee, 60 N.E.3d 1025, 1031 (Ind. 2016) (alteration in original) (quoting Ind. Evidence Rule 401). And "[g]enerally speaking, relevant evidence is admissible" under Rule 402. Majors v. State, 748 N.E.2d 365, 368 (Ind. 2001) (citing Evid. R. 402).

But relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Evid. R. 403. To this end, Rule 403 is a gatekeeping rule. See TP Orthodontics, Inc. v. Kesling, 15 N.E.3d 985, 998 (Ind. 2014); Steward v. State, 652 N.E.2d 490, 498 (Ind. 1995). When these risks substantially outweigh the probative value, the evidentiary gates remain closed.

Because this case presents evidentiary issues properly resolved through Rule 403's gatekeeping function, we—like the Court of Appeals—decline to make "sweeping pronouncements" about immigration policy. Escamilla, 54 N.E.3d at 1015. After all, we are concerned today with judicial evidentiary standards, not with executive or legislative immigration policies. See Meredith v. Pence, 984 N.E.2d 1213, 1216 (Ind. 2013) ("Whether [Indiana's school voucher program] is wise educational or public policy is not a consideration germane to the narrow

issues of Indiana constitutional law that are before us. Our individual policy preferences are not relevant.").

*B. National approaches vary, but most courts applying the Rule 403 test find unauthorized immigration status inadmissible in decreased earning capacity claims.*

Most courts confronting the admissibility of a plaintiff's unauthorized immigration status apply Rule 403's balancing test in decreased earning capacity cases. They first determine whether immigration status is relevant, then—if it is—balance that relevance against the dangers of admitting the immigration status. This test has led several courts to exclude immigration status either because it is irrelevant or because the danger of unfair prejudice substantially outweighs its relevance.

The Supreme Courts of both California and Virginia, for example, have found immigration status irrelevant—and added that even if it were relevant, the danger of unfair prejudice would bar its admission. Clemente v. California, 707 P.2d 818, 829 (Cal. 1985); Peterson v. Neme, 281 S.E.2d 869, 872 (Va. 1981).

Most courts, though, have concluded that immigration status is relevant to damages—though not to liability—in a decreased earning capacity claim. However, many of those courts have found that the danger of unfair prejudice substantially outweighs the relevance. Ayala v. Lee, 81 A.3d 584, 597 (Md. Ct. Spec. App. 2013) ("[C]ourts that have balanced the relevance and prejudice inquiries have frequently come down on the side of 'prejudicial' because of the low probative value of evidence of immigration status."). The Washington Supreme Court, for example, held that "with regard to lost future earnings, the probative value of a plaintiff's undocumented status, by itself, is substantially outweighed by the danger of unfair prejudice." Salas v. Hi-Tech Erectors, 230 P.3d 583, 587 (Wash. 2010) (en banc); see also Gonzalez v. City of Franklin, 403 N.W.2d 747, 760 (Wis. 1987) (weighing the "speculative or conjectural" relevance of immigration status evidence against its "obvious prejudicial effect"); Republic Waste Servs., Ltd. v. Martinez, 335 S.W.3d 401, 408, 411 (Tex. App. 2011) (citing TXI Transp. Co. v. Hughes, 306 S.W.3d 230, 243–44 (Tex. 2010)).

Only New Hampshire has resolved the balance the other way, reasoning that while immigration status "may well be prejudicial," it is also "essential" to lost earning capacity claims. Rosa, 868 A.2d at 1002. A few other courts have skipped the balancing test altogether, apparently

assuming the admissibility of a plaintiff's undocumented immigration status. Balbuena, 845 N.E.2d at 1259; Villasenor v. Martinez, 991 So. 2d 433, 436–37 (Fla. Dist. Ct. App. 2008); Melendres v. Soales, 306 N.W.2d 399, 402 (Mich. Ct. App. 1981).

Most courts applying Rule 403, then, exclude immigration status either because it is irrelevant or because any relevance is substantially outweighed by certain dangers. Having surveyed this landscape, we apply our own Rule 403 analysis. We look first to the relevance of unauthorized immigration status, then balance that relevance against the dangers of confusing the issues and unfair prejudice. As discussed below, we conclude that even though unauthorized immigration status is relevant to decreased earning capacity claims, the dangers of confusion and unfair prejudice make it inadmissible unless the plaintiff is more likely than not to be deported.

### III. Under Rule of Evidence 403, a Plaintiff's Unauthorized Immigration Status Is Inadmissible Unless the Proponent Shows by a Preponderance that the Plaintiff Will Be Deported.

While unauthorized immigration status is relevant to a plaintiff's decreased earning capacity, it also carries a high risk of confusing the issues and some risk of unfair prejudice. Because of these dangers, a plaintiff's unauthorized immigration status is admissible only under one limited circumstance: if the evidence's proponent shows by a preponderance—in other words, that it is more likely than not—that the plaintiff will be deported.

*A. Unauthorized immigration status clears Rule 401's low bar for relevance.*

Shiel Sexton argues that Escamilla's immigration status is relevant to his decreased earning capacity damages. We agree because his immigration status affects his chances of deportation and ability to work in the United States over the course of his career. A jury could factor in the probability that his immigration status would lead to deportation or an inability to work, and reduce damages proportionally. See 22 Am. Jur. 2d Damages § 159 (2013) (stating a jury should take into account "contingencies to which [the plaintiff's income is] liable"). Because of this potential reduction in earning capacity, unauthorized immigration status clears the low bar set by Rule 401's "liberal standard for relevancy." Konopasek v. State, 946 N.E.2d 23, 27 (Ind. 2011). We therefore proceed to the other side of Rule 403 to determine whether the risks of confusing the issues and unfair prejudice substantially outweigh this relevance.

9

*B. Unauthorized immigration status carries a high risk of confusing the issues and some risk of unfair prejudice.*

Even though a plaintiff's unauthorized immigration status is relevant, Rule 403 directs courts, as gatekeepers, to exclude evidence if its risks substantially outweigh its relevance. We look to two of Rule 403's risks: confusing the issues and unfair prejudice. Confusing the issues is concerned with the evidence growing "so intricate that the disentanglement of it becomes difficult" or becoming such "a mass of confused data" that the jury loses sight of the main issue. J. Wigmore, 2 Wigmore on Evidence § 443 at 529 (1979), 6 Wigmore on Evidence § 1864 at 643. And unfair prejudice "looks to the capacity of the evidence to persuade by illegitimate means, or the tendency of the evidence to suggest decision on an improper basis." Camm v. State, 908 N.E.2d 215, 224 (Ind. 2009) (quoting Ingram v. State, 715 N.E.2d 405, 407 (Ind. 1999)). We conclude that in decreased earning capacity claims, these risks will often substantially outweigh the probative value of unauthorized immigration status.

1.  Unauthorized immigration status carries a high risk of confusing the issues.

Unauthorized immigration status presents a significant risk of confusing the issues because it would flood the courtroom with arguments and evidence on immigration status and deportation risk, resulting in a "collateral mini-trial" on immigration. State v. Buccheri-Bianca, 312 P.3d 123, 127 (Ariz. Ct. App. 2013). This collateral mini-trial would require in-depth expert testimony from both parties, as it is "elementary that the jury cannot be left to speculate or conjecture" about decreased earning capacity damages, Scott v. Nabours, 296 N.E.2d 438, 441 (Ind. Ct. App. 1973). And in most cases, that immigration mini-trial would bring more confusion than clarity.

*a.  Immigration policy is constantly shifting.*

In a collateral mini-trial on immigration, the jury would have to hear and understand evidence about ever-shifting government policies and priorities. See Arizona v. United States, 567 U.S. 387, 395 (2012) ("Federal governance of immigration and alien status is extensive and complex.").

Immigration policy's complexities begin with the power shared by Congress and the Executive. While "Congress has specified which aliens may be removed from the United States and the procedures for doing so," the Executive retains "broad discretion" in admissibility

10

determinations, securing the borders, and apprehending and removing undocumented immigrants. Id. at 396. So immigration policy comes from multiple potentially competing sources.

Indeed, this shared power structure means that some policies last for decades while others change as fast as—or faster than—presidential administrations. IRCA, for example, was enacted by Congress "as a comprehensive framework for 'combating the employment of illegal aliens'" and has been in force for over thirty years. Id. at 404 (quoting Hoffman, 535 U.S. at 147). But executive policy changes at a far quicker pace. In 2012, the Executive implemented DACA—the Deferred Action for Childhood Arrivals program. Crane v. Johnson, 783 F.3d 244, 248 (5th Cir. 2015). This program, on a case-by-case basis, defers the deportation of unauthorized immigrants who meet five criteria, including arriving in the United States before turning sixteen.[3] Id. Then in 2014 the Executive added DAPA—Deferred Action for Parent Arrivals—a second, similar program deferring deportation for certain parents of U.S. citizens or lawful permanent residents. Id. at 248 n.12.

But while the Executive enjoys "broad discretion" in many immigration contexts, executive actions are barred if "foreclosed by" and "manifestly contrary to" Congressional pronouncement. Texas v. United States, 809 F.3d 134, 186 (5th Cir. 2015), aff'd by an equally divided Court, United States v. Texas, 136 S. Ct. 2271 (2016). The Southern District of Texas barred the Executive from implementing DAPA on this basis, and the Fifth Circuit upheld that injunction on appeal. Id. at 188. And while the original DACA program remains in force so far, executive actions implemented by one administration can as easily be undone by the next.

Another major area of executive policymaking discretion is deportation volume and priorities. For example, in 2014, the federal government removed 414,481 unauthorized immigrants out of an estimated 11.1 million.[4] These removals reflect discretionary enforcement

---

[3] The other criteria are being under the age of thirty-one as of June 15, 2012; continuously residing in the United States since June 15, 2007; remaining in school, graduating from high school, obtaining a GED, or being honorably discharged from the Coast Guard or the United States Armed Forces; and not being convicted of a felony, significant misdemeanor, or multiple misdemeanors, or otherwise posing a threat to national security or public safety. Crane, 783 F.3d at 248.

[4] Bryan Baker & Christopher Williams, Annual Report, Office of Immigration Statistics, Immigration Enforcement Actions: 2014 (January 2016), https://www.dhs.gov/sites/default/files/publications/Enforcement_Actions_2014.pdf; Jeffrey S. Passel & D'Vera Cohn, Pew Research Center, Overall Number of U.S.

priorities and removal patterns. In 2015, over ninety-seven percent of those removed had been convicted of a crime or apprehended at or near United States borders or ports of entry.[5] And ninety-eight percent fit "enforcement priorities" based on factors such as criminal convictions, failed border crossings, national security threats, abuse of visa programs, and previous orders for removal.[6] These statistics give only a sampling of considerations that would go before the jury to help them calculate an immigrant's chances of deportation.

But historical statistics—even those only a few years old—cannot fully capture present and future policies. A 2014 executive order, for example, set a removal priority for immigrants convicted of crimes. But that order's 2017 replacement expanded priorities to:

> [R]emovable aliens who:
> (a) Have been convicted of any criminal offense;
> (b) Have been charged with any criminal offense, where such charge has not been resolved;
> (c) Have committed acts that constitute a chargeable criminal offense;
> (d) Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;
> (e) Have abused any program related to receipt of public benefits;
> (f) Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or
> (g) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.[7]

While this expansion is substantial, only time will tell where and how it will be enforced.

Congressional action, executive action, executive repeal, executive discretion, executive priorities, and judicial review make shifting government policies and priorities troublesome for

---

Unauthorized Immigrants Holds Steady Since 2009 (Sept. 20, 2016), http://www.pewhispanic.org/2016/09/20/overall-number-of-u-s-unauthorized-immigrants-holds-steady-since-2009/.

[5] See Written Testimony of ICE Enforcement and Removal Operations Executive Associate Director Thomas Homan for a Senate Committee on the Judiciary (May 19, 2016), https://www.dhs.gov/news/2016/05/19/written-testimony-ice-senate-judiciary-subcommittee-immigration-and-national.

[6] Id.

[7] The White House, Executive Order: Enhancing Public Safety in the Interior of the United States (Jan. 25, 2017), https://www.whitehouse.gov/the-press-office/2017/01/25/presidential-executive-order-enhancing-public-safety-interior-united.

juries to first understand, and then to apply prospectively. We will not ask them to do so lightly, particularly in tort cases like this one where immigration is a tangential issue.

    *b.   Plaintiffs may have many opportunities to adjust their immigration status.*

In addition to understanding our complex and infinitely variable immigration system, juries would have to apply that understanding to specific people. This requires the often-immense undertaking of evaluating the plaintiff's opportunities to gain legal residency. Indeed, this very case shows the difficulty in pinning down past, present, and future immigration statuses. As Shiel Sexton understates, "Escamilla's immigration status has been something of a moving target."

DACA and DAPA—the programs identified above—alone promise deferred action for nearly half of the estimated 11.1 million unauthorized immigrants living in the United States. At the end of 2016, over 750,000 applicants had been approved for DACA[8] out of an estimated 1.9 million potentially eligible immigrants.[9] And an additional estimated 3.5 million unauthorized immigrants would be eligible for deportation relief under DAPA.[10] But the eligibility requirements are complex, forcing the jury to evaluate the chances any given person would be accepted.

And eligibility for or even acceptance into these programs does not ease the jury's burden. As noted above, these programs can be blocked in the courts or rescinded—or even ignored by the Executive. Deferred deportation is, after all, a matter of prosecutorial discretion even for those accepted into the programs.[11]

---

[8] Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2016_qtr4.pdf.

[9] Faye Hipsman et al., Migration Policy Institute, DACA at Four: Participation in the Deferred Action Program and Impacts on Recipients (August 2016), http://www.migrationpolicy.org/research/daca-four-participation-deferred-action-program-and-impacts-recipients.

[10] Jens Manuel Krogstad, Pew Research Center, Key facts about immigrants eligible for deportation relief under Obama's expanded executive actions (Jan. 19, 2016), http://www.pewresearch.org/fact-tank/2016/01/19/key-facts-immigrants-obama-action/.

[11] U.S. Citizen and Immigration Services, Frequently Asked Questions (Apr. 25, 2017), https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions ("DHS can terminate or renew deferred action at any time, at the agency's discretion.").

In addition to those programs, United States citizens' immediate relatives—such as Escamilla—have a specific path to lawful permanent residency. See 8 U.S.C. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A)(i); 8 CFR § 204.1. This path requires the citizen relative to file a Form I-130 Petition for Alien Relative and the immigrant to file a Form I-485 Application to Adjust Status.[12] United States v. Chahla, 752 F.3d 939, 942 n.2 (11th Cir. 2014). But even these immigration status adjustments are never simple. Instead, they are partially dependent on whether a person is "inadmissible." See 8 U.S.C. § 1182 (making "aliens . . . inadmissible" for several reasons, including health, criminal convictions, and national security). That determination is also complex, often turning on exceptions and nuances that complicate any admissibility determination. E.g. id. § 1182(a)(2)(A)(ii); (a)(3)(B)(ii); (a)(3)(C)(ii), (iii); (a)(3)(D)(iv).

Today's statistics and policies simply cannot reveal what tomorrow holds—a truth particularly relevant in the immigration context. Because decreased earning capacity is based on a plaintiff's entire working life, many changes—favorable and unfavorable to each side—can occur. The arguments and evidence about decades of policy would constitute a collateral mini-trial on immigration, requiring juries to apply nuanced statistics and answer highly debatable and uncertain questions.

Of course, despite the many complexities of a collateral immigration mini-trial, we are not saying that juries *cannot* make myriad immigration determinations. We maintain our "strong faith in the ability of the jury to decide such complex questions." Mayhue v. Sparkman, 653 N.E.2d 1384, 1389 (Ind. 1995). But the vast scope and fluid nature of immigration policy and status counsels that juries typically *should not* make these determinations.

The way complex immigration law has invaded this opinion demonstrates the way it would invade Escamilla's tort case if his immigration status were admitted. Immigration arguments and evidence would "flood the courtroom." See Thompson v. State, 690 N.E.2d 224, 236 (Ind. 1997) (quoting United States v. Smith, 80 F.3d 1188, 1193 (7th Cir. 1996)). Injecting such a specialized and complex mini-trial into Escamilla's tort case creates too high a risk of confusing the issues.

      *c. Special tests, like New Hampshire's, for recovering decreased earning capacity complicate, rather than simplify, the jury's determinations.*

---

[12] Escamilla has filed a Form I-485, but the record does not indicate whether his wife or another relative has filed the prerequisite Form I-130.

While immigration status thus creates an unacceptably high risk of confusing the issues, some states have further muddied the waters by imposing additional considerations on juries. For example, in <u>Rosa</u>, the New Hampshire Supreme Court held that unauthorized immigrants cannot recover lost United States earnings unless their employers "knew or should have known" of their unauthorized status. 868 A.2d at 1000–01. This test adds yet another wrinkle for juries, increasing their focus on immigration and forcing them to decide what an employer "knew or should have known." <u>Id.</u> It also would require juries to hear evidence about whether and how, such as through the federal E-Verify system, an employer investigated an employee's immigration status before hiring.[13]

Indeed, New Hampshire's "unclean hands" approach illustrates an additional layer of confusion that immigration status would inject into tort cases like this one. This approach understandably aims to deter employers from knowingly hiring unauthorized immigrants and then using immigration status to *decrease* liability. Yet this concern cuts both ways, as employees may be able to seek status adjustments primarily to *increase* their award. And the two are not mutually exclusive—it is not hard to imagine both sides taking these measures. Asking juries to sort out motivations in this immigration context in order to best make injured parties whole would only exacerbate the confusion of the issues. <u>See</u> <u>Patchett</u>, 60 N.E.3d at 1028 ("Indiana tort law seeks to make injured parties whole.").

For these reasons, New Hampshire's attempted solution hurts more than it helps—increasing the dangers of admitting immigration status and complicating juries' work. We conclude the better approach is to resolve this question through Rule 403—thus entrusting it to the trial court's gatekeeping role. <u>See</u> <u>TP Orthodontics, Inc.</u>, 15 N.E.3d at 998. This approach resolves the chances-of-deportation determination, and the resulting admissibility conclusion, before trial rather than in a collateral mini-trial to the jury.

2.  Unauthorized immigration status carries some risk of unfair prejudice.

The risk of confusing the issues is our primary, but not our only, consideration. We also look to one of Rule 403's other factors: unfair prejudice. We have held, for example, that child molestation evidence, <u>Camm</u>, 908 N.E.2d at 225, gruesome photographs, <u>see</u> <u>Pruitt v. State</u>, 834

---

[13] In this case, the record gives no indication that Masonry By Mohler checked Escamilla's immigration status prior to his injury.

N.E.2d 90, 118 (Ind. 2005), a gun and bullets, Hubbell v. State, 754 N.E.2d 884, 890 (Ind. 2001), and drug purchases evidence, Jenkins v. State, 729 N.E.2d 147, 149 (Ind. 2000), should be excluded in certain cases as substantially more unfairly prejudicial than probative. We have also "emphasized that the relevant inquiry is not merely whether the matter is prejudicial to the defendant's interests, but whether it is *unfairly* prejudicial." Baer v. State, 866 N.E.2d 752, 763 (Ind. 2007) (quotation omitted).

Immigration status does, of course, carry some risk of unfair prejudice—as courts across this country have realized. This is because immigration status "introduces a factor into the case that might encourage the jury to dislike or disapprove of [a party] independent of the merits." Ayala, 81 A.3d at 597 (alteration in original) (quoting United States v. Amaya-Manzanares, 377 F.3d 39, 45 (1st Cir. 2004)). And because illegal immigration is, for many, a sensitive issue—personally, ethically, and politically—it "can inspire passionate responses that carry a significant danger of interfering with the fact finder's duty to engage in reasoned deliberation." Salas, 230 P.3d at 586.

This observation does not disparage Indiana juries, as Shiel Sexton suggests it might. Quite the contrary; Indiana has long respected juries' pivotal role in our tort system. See, e.g., Patchett, 60 N.E.3d at 1032 (citing Ind. Const. art. 1, §§ 13(a), 20) (honoring "our deep, abiding faith in the jury system"). But alongside our faith in juries, we must recognize the dangers inherent in some types of evidence. Bloom v. Franklin Life Ins. Co., 97 Ind. 478, 486 (1884) ("Courts cannot be ignorant of the nature of men, and must attribute to them the ordinary passions and weaknesses inherent in human nature."). Escamilla's immigration status carries with it some risk of unfair prejudice, and that risk when combined with the risk of confusing the issues counsels against its admission.

## C. A plaintiff's unauthorized immigration status is inadmissible unless the evidence's proponent shows by a preponderance that the plaintiff will be deported.

From these Rule 403 factors, we distill a framework for the admissibility of a plaintiff's unauthorized immigration status. A plaintiff's unauthorized immigration status is inadmissible unless the preponderance of the evidence shows that the plaintiff will be deported. Three principal considerations support this framework.

16

First, this standard accounts for the consistently confusing and evolving nature of federal immigration law. As we have noted, immigration policies and statuses are inevitably confusing any time an unauthorized immigrant is involved. Congressional and presidential immigration policies and programs can be imprecise, discretionary, and subject to judicial review. And even when a person is demonstrably eligible for certain programs, understanding and applying removal priorities remains challenging. It is difficult, if not impossible, to guess when programs may be suspended or ignored even after accepting applications.

While the combined risks of confusing the issues and unfair prejudice are consistently high, immigration status's relevance waxes and wanes with the chances of deportation. For immigrants like Escamilla, for example, the chances have historically been quite small—perhaps as high as three percent. See Escamilla, 54 N.E.3d at 1023–24 (Baker, J., dissenting); see also Salas, 230 P.3d at 585 (identifying a less-than-one-percent chance of an undocumented immigrant like Escamilla being apprehended, and an even smaller chance of deportation). But for others, the chances have been, and may continue to be, much higher.[14] Ultimately, unless the proponent of the evidence establishes that the plaintiff will more likely than not be deported, the risks of confusion or prejudice from immigration status will substantially outweigh its probative value.

Second, placing the burden of proof on the proponent of the immigration evidence has both legal and practical justifications. Legally, it is consistent with precedent in the similar context of Rule of Evidence 609(b)(1)—where evidence of criminal convictions more than ten years old is inadmissible unless "*the proponent* demonstrates that the probative value of the stale conviction evidence substantially outweighs its prejudicial effect." Stephenson v. State, 742 N.E.2d 463, 485 (Ind. 2001) (emphasis added) (citing Evid. R. 609(b)). And practically, as Judge Baker's dissent recognized, routinely admitting immigration evidence would often let employers pay substantially lower injury damages to unauthorized immigrants, thus decreasing incentives for guarding worker safety while increasing incentives for illegal hiring. See Escamilla, 54 N.E.3d at 1025 (Baker, J., dissenting).

Finally, even though proof that a particular immigrant will more likely than not be deported may be a steep showing, it is still the least cumbersome alternative. Requiring plaintiffs to prove

---

[14] See Written Testimony of ICE Enforcement and Removal Operations Executive Associate Director Thomas Homan for a Senate Committee on the Judiciary, supra note 5.

that they will *not* likely be deported would require them to prove a negative—a burden we rarely impose. E.g., Villas W. II of Willowridge Homeowners Ass'n, Inc. v. McGlothin, 885 N.E.2d 1274, 1282 (Ind. 2008) (adopting burden-shifting test for disparate-impact claims that, among other advantages, avoided requiring either party to prove a negative); Milledge v. Oaks, 784 N.E.2d 926, 931 (Ind. 2003) (declining to adopt test for certain worker's compensation claims that would require the injured employee to prove a negative).

For these reasons, the admissibility of immigration status under Rule 403 for decreased earning capacity claims turns on the chances of deportation. If a plaintiff is more likely than not to be deported, the relevance is necessarily so high that it will not be substantially outweighed by the evidence's risks. But if the chances of deportation fall below that level, immigration status should be excluded to avoid the dangers of confusing the issues and unfair prejudice.

## IV. The Trial Court Abused Its Discretion in Barring Experts Ford and Missun from Testifying at Trial.

After finding Escamilla's immigration status admissible, the trial court closed discovery and barred Ford and Missun from testifying about Escamilla's decreased earning capacity because they failed to take into account his immigration status. Since that failure goes to weight, not admissibility, Ford and Missun should be allowed to testify about their decreased earning capacity calculations regardless of whether Escamilla's immigration status is admissible. We therefore reverse their testimony's exclusion as an abuse of discretion.

Under Indiana Rule of Evidence 702(a), expert witnesses may testify if their "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." This standard is a liberal one; "[e]vidence need not be conclusive to be admissible." Turner v. State, 953 N.E.2d 1039, 1050 (Ind. 2011).

Because Ford and Missun's testimony would "help the trier of fact" determine Escamilla's decreased earning capacity—a responsibility requiring expert testimony—it was an abuse of discretion to exclude it. In their report, Ford and Missun outline their calculations and methodology, reaching the conclusion that Escamilla's decreased earning capacity was $578,194 on the low end, and $947,421 on the high end. Once explained to the jury, these figures and their underlying methodology would be a great help in determining Escamilla's damages.

And if Shiel Sexton doubts Ford and Missun's testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993)). Trial will bring ample opportunity for these approaches, provided they do not stray into inadmissible evidence.

Finally, because we remand for additional evidentiary determinations, we note that discovery will likely need to be reopened so the parties can present the evidence required for further proceedings under this opinion.

**Conclusion**

To determine whether a plaintiff's unauthorized immigration status is admissible in decreased earning capacity claims, trial courts must weigh any relevance against the dangers of unfair prejudice and confusing the issues. Specifically, these dangers will substantially outweigh relevance unless the evidence's proponent shows by a preponderance of the evidence that the plaintiff will be deported. We reverse the trial court's evidentiary rulings and remand for it to apply this framework to Escamilla's case.

Rucker, David, Massa, and Slaughter, JJ., concur.